SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. William L. Witt (A-9-14) (074468)**

**Argued April 14, 2014 -- Decided September 24, 2015**

**ALBIN, J., writing for a majority of the Court.**

In this appeal, the Court addresses the constitutional standard governing an automobile search and considers whether to continue to follow the standard set forth in State v. Pena-Flores, 198 N.J. 6 (2009).

Defendant William L. Witt was charged in an indictment with second-degree unlawful possession of a firearm and second-degree possession of a weapon by a convicted person. The police initiated a stop of defendant's car because he did not dim his high beams when necessary, and a search of his vehicle uncovered the handgun.

Defendant moved to suppress the gun on the ground that the police conducted an unreasonable search in violation of the New Jersey Constitution. Defendant's sole argument was that the police did not have exigent circumstances to justify a warrantless search of his car under Pena-Flores. At the suppression hearing, Officer Racite testified that at approximately 2:00 a.m., while providing backup for a motor-vehicle stop, he observed a car pass with its high beams on. The officer explained that a car must dim its high beams "as vehicles approach." Thus, Officer Racite stopped the vehicle, and requested backup. Defendant, the driver, appeared intoxicated and was asked to exit his car. Defendant then failed field-sobriety and balance tests, and Officer Racite arrested him for driving while intoxicated. Defendant was handcuffed and placed in the back of a patrol car. While Officer Racite searched defendant's vehicle for "intoxicants," he found a handgun in the center console. With Pena-Flores as its guide, the trial court found as follows: the officer had a right to stop defendant's car based on an "unexpected" occurrence and had probable cause to search for an open container of alcohol, but did not have "sufficient exigent circumstances" to conduct a warrantless search. Accordingly, the court suppressed the handgun.

The Appellate Division granted the State's motion for leave to appeal and affirmed the suppression of the gun "because of the utter absence of any exigency to support the warrantless vehicle search that occurred," and "because there was no justification for this motor vehicle stop." 435 N.J. Super. 608, 610-11 (App. Div. 2014). The panel declined to address the State's argument that the exigent-circumstances test in Pena-Flores "should be replaced because it has proved to be unworkable and has led to unintended negative consequences," explaining that, as an intermediate appellate court, it had no authority to replace Pena-Flores with some other legal principles. The panel also agreed with defendant's argument, raised for the first time on appeal, that Officer Racite did not have a reasonable and articulable suspicion to stop defendant because the relevant statute (N.J.S.A. 39:3-60) requires drivers to dim their high beams only when approaching an oncoming vehicle within 500 feet.

The Court granted the State's motion for leave to appeal. 219 N.J. 624 (2014).

**HELD:** The exigent-circumstances standard set forth in Pena-Flores is unsound in principle and unworkable in practice. Citing Article I, Paragraph 7 of New Jersey's State Constitution, the Court returns to the standard articulated in State v. Alston, 88 N.J. 211 (1981), for warrantless searches of automobiles based on probable cause: The automobile exception authorizes the warrantless search of an automobile only when the police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous.

1. Before addressing the parties' arguments on the constitutional standard governing the search of defendant's vehicle, the Court disposes of his challenge to the lawfulness of the stop. Defendant did not challenge the validity of the motor-vehicle stop before the trial court, but now claims that the filing of a motion to suppress under Rule 3:5-7(a) required the State to justify every aspect of the warrantless search, including the initial stop. The Court rejects defendant's contention and concludes that the Appellate Division should have declined to entertain the belatedly

raised issue. The Court reverses the Appellate Division on this point and holds that the lawfulness of the stop was not preserved for appellate review. (pp. 8-10)

2. Having addressed defendant's challenge to the lawfulness of the stop, the Court turns to the constitutional standard governing the search of defendant's vehicle. The automobile exception to the warrant requirement -- as defined by the United States Supreme Court in construing the Fourth Amendment -- authorizes a police officer to conduct a warrantless search of a motor vehicle if it is "readily mobile" and the officer has "probable cause" to believe that the vehicle contains contraband or evidence of an offense. Under federal law, probable cause alone satisfies the automobile exception to the warrant requirement. The federal automobile exception does not require a separate finding of exigency in addition to a finding of probable cause, as is the case in New Jersey. The overwhelming majority of states have adopted the federal approach to the automobile exception and do not require exigency beyond the inherent mobility of the vehicle. (pp. 13-21)

3. In State v. Alston, 88 N.J. 211 (1981), the Supreme Court of New Jersey upheld the constitutionality of the search of the defendants' car based on the United States Supreme Court's then-articulated automobile exception to the warrant requirement. In doing so, the Court stated that "the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile stopped on the highway." Id. at 233. However, in State v. Cooke, 163 N.J. 657 (2000), the Court announced that, under Article I, Paragraph 7 of New Jersey's State Constitution, the warrantless search of a vehicle could only be justified based on exigent circumstances in addition to probable cause. Pena-Flores reaffirmed the standard enunciated in Cooke, and declared that "the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant." 198 N.J. at 28. The Court further set forth a multi-factor test to guide police officers in determining whether exigent circumstances excused the securing of a warrant, and encouraged the use of telephonic and electronic warrants as a means to meet the constitutional challenges of roadway stops. (pp. 21-32)

4. In the wake of Pena-Flores, this Court created the Supreme Court Special Committee on Telephonic and Electronic Search Warrants, which issued a report in January 2010. The Committee concluded that safety and police resource concerns dictated that search-warrant applications be completed in no more than 45 minutes, with an ideal goal of 30 minutes. The Committee further outlined six steps to be taken in securing a telephonic search warrant when a police officer believes that there is probable cause to search. Thereafter, the Administrative Office of the Courts conducted two pilot programs. The first lasted only two months and yielded little usable data. The second ran in Burlington County from September 2011 to March 2012. During that period, the State Police and local law-enforcement agencies filed 42 telephonic automobile search-warrant applications. The average request for an automobile warrant took approximately 59 minutes, from the inception of the call to its completion. Separately, the State Police reported to the Administrative Office of the Courts that Troop C applied for 16 telephonic search warrants, with the process taking, on average, 1.5 to 2 hours. The State Police also reported that since Pena-Flores, its state-wide consent to search requests rose from approximately 300 per year to over 2500 per year, and that its patrol policy is to exhaust the consent search option prior to making a determination to seek a warrant, telephonic or in-person. (pp. 32-35)

5. In State v. Shannon, 210 N.J. 225, 227 (2012), the Court declined the State's request to revisit Pena-Flores, finding that the motor-vehicle data submitted by the State was insufficient "to establish the 'special justification' needed to depart from precedent." However, the Court invited the parties to amass and develop a more thorough, statistical record relating to motor vehicle stops by the State Police and local authorities. Thereafter, the Office of Law Enforcement Professional Standards published a report entitled "The Effects of Pena-Flores on Municipal Police Departments." The one firm conclusion reached by the report was that "after the Pena-Flores decision, there was a noticeable increase in consent to search requests for both municipal departments and the State Police; even with only a slight increase in the number of motor vehicle stops." (pp. 36-38)

6. Resolution of the issue before the Court implicates the doctrine of stare decisis. Because stare decisis promotes consistency, stability, and predictability in the development of legal principles and respect for judicial decisions, a "special justification" is required to depart from precedent. That said, stare decisis is not an inflexible principle depriving courts of the ability to correct their errors. Among the relevant considerations in determining whether to depart from precedent are whether the prior decision is unsound in principle and unworkable in practice. The Court,

2

therefore, turns to consider whether <u>Pena-Flores</u> is furthering the constitutional values that are protected by the New Jersey Constitution and whether there is "special justification" for departing from it. (pp. 39-42)

7. The use of telephonic search warrants has not resolved the difficult problems arising from roadside searches, as the Court expected when it decided <u>Pena-Flores</u>. Prolonged encounters on the shoulder of a crowded highway may pose an unacceptable risk of serious bodily injury and death to both police officers and citizens. Moreover, the seizure of the car and the motorist's detention may be a greater intrusion on a person's liberty interest than the search is on a person's privacy interest. Finally, the dramatic increase in the number of consent searches since <u>Pena-Flores</u> is apparently an unintended consequence of that decision, reflecting the difficulty presented to police officers by the <u>Pena-Flores</u> multi-factor exigent-circumstances standard. The Court is concerned about consent searches in such great numbers, particularly in light of the historic abuse of such searches and the coercive effect of a search request made to a motorist stopped on the side of a road. The Court, therefore, concludes that the current approach to roadside searches premised on probable cause places significant burdens on law enforcement without any real benefit to the public. (pp. 42-50)

8. Although the Court determines that the exigent-circumstances standard set forth in <u>Cooke</u> and <u>Pena-Flores</u> is unsound in principle and unworkable in practice, it does not adopt the federal standard for automobile searches because it is not fully consonant with the interests embodied in Article I, Paragraph 7 of the State Constitution. The Court returns to the <u>Alston</u> standard, which states that the automobile exception authorizes the warrantless search of an automobile only when the police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous. The Court's decision limits the automobile exception to on-scene warrantless searches, unlike federal jurisprudence, which allows a police officer to conduct a warrantless search at headquarters merely because the officer could have done so on the side of the road. (pp. 50-53)

9. The Court's decision is a new rule of law to be applied prospectively. Therefore, for purposes of this appeal, <u>Pena-Flores</u> is the governing law. However, going forward, the exigent-circumstances test in <u>Cooke</u> and <u>Pena-Flores</u> no longer applies, and the standard set forth in <u>Alston</u> for warrantless searches of automobiles based on probable cause governs. (pp. 53-55)

The judgment of the Appellate Division is **AFFIRMED,** and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**JUSTICE LaVECCHIA**, **DISSENTING**, expresses the view that the State has not shown a special justification to merit departure from settled law, and, therefore, <u>stare decisis</u> should prevail. Justice LaVecchia asserts that, contrary to the majority's characterization, <u>Cooke</u> and <u>Pena-Flores</u> are not "unsound in principle," and, further, the State has failed to show that the current law is "unworkable in practice."

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-VINA, AND SOLOMON join in JUSTICE ALBIN's opinion. JUSTICE LaVECCHIA filed a separate, dissenting opinion, in which JUDGE CUFF (temporarily assigned) joins.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

WILLIAM L. WITT,

    Defendant-Respondent.


       Argued April 14, 2015 – Decided September 24, 2015

       On appeal from the Superior Court, Appellate Division, whose opinion is reported at 435 N.J. Super. 608 (App. Div. 2014).

       Ronald Susswein, Assistant Attorney General, argued the cause for appellant (John J. Hoffman, Acting Attorney General of New Jersey, attorney).

       Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney).

       Brooks H. Leonard argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Coughlin Duffy, attorneys; Mr. Leonard and Michael J. Sullivan, of counsel and on the brief).

       Alexander R. Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Ronald K. Chen, Rutgers Constitutional Rights Clinic Center for Law & Justice and Edward L. Barocas, attorneys; Mr. Shalom, Mr. Chen, Mr. Barocas, and Jeanne M. LoCicero, of counsel and on the brief).

Jeffrey Evan Gold argued the cause for amicus curiae New Jersey State Bar Association (Paris P. Eliades, President, Gold & Associates, and Yonta Law, attorneys; Mr. Gold and Mr. Eliades, of counsel; Mr. Gold, Kimberly A. Yonta, and Justin M. Moles, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

In this appeal, we are called on to determine whether the constitutional standard governing an automobile search in State v. Pena-Flores, 198 N.J. 6 (2009) is unsound in principle and unworkable in practice.

In Pena-Flores, supra, 198 N.J. at 28, a deeply divided Court reaffirmed its departure from the standard for automobile searches set forth in State v. Alston, 88 N.J. 211, 233 (1981). In Alston, we determined that a warrantless search of an automobile was constitutionally permissible, provided that the police had probable cause to search the vehicle and that the police action was prompted by the "unforeseeability and spontaneity of the circumstances giving rise to probable cause." Id. at 233, 235. The Alston standard was seemingly consistent with the federal exception to the warrant requirement.

In State v. Cooke, 163 N.J. 657, 670 (2000), invoking our State Constitution, the Court overthrew the Alston standard and added a pure exigent-circumstances requirement to justify an automobile search. Pena-Flores maintained the course charted by

2

Cooke.  Pena-Flores also set forth a multi-factor test to guide police officers in determining whether exigent circumstances excused the securing of a warrant and encouraged the use of telephonic warrants as a means of shortening roadway stops.  The Court expected that its exigent-circumstances test would provide a reliable guide to law enforcement and that telephonic warrants would present an efficient and speedy way of curbing prolonged roadway stops.  Those expectations have not come to pass.

Experience and common sense persuade us that the exigent-circumstances test in Pena-Flores does not provide greater liberty or security to New Jersey's citizens and has placed on law enforcement unrealistic and impracticable burdens.  First, the multi-factor exigency formula is too complex and difficult for a reasonable police officer to apply to fast-moving and evolving events that require prompt action.  Thus, we cannot expect predictable and uniform police or judicial decision-making.  Second, the securing of telephonic warrants results in unacceptably prolonged roadway stops.  During the warrant-application process, the occupants of a vehicle and police officers are stranded on the side of busy highways for an extended period, increasing the risk of serious injury and even death by passing traffic.  If the car is impounded, then the occupants' detention will be extended for an even longer period as a warrant is procured.  Third, one of the unintended

3

consequences of Pena-Flores is the exponential increase in police-induced consent automobile searches. The resort to consent searches suggests that law enforcement does not consider time-consuming telephonic warrants or the amorphous exigent-circumstances standard to be a feasible answer to roadway automobile searches. The heavy reliance on consent searches is of great concern given the historical abuses associated with such searches and the potential for future abuses.

Adherence to stare decisis serves a number of salutary purposes, including promoting certainty and stability in our law. However, stare decisis is not a command to continue on a misguided course or to hold tight to a failed policy. We do not overturn precedent lightly, and certainly not without good cause or a special justification. Because we believe that good cause and special justification are present here, we return to the standard that governed automobile searches in Alston -- a standard that is more in line with the jurisprudence of most other jurisdictions, yet still protective of the right of citizens to be free from unreasonable searches.

I.

A.

Defendant William L. Witt was charged in an indictment with second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon by a convicted

4

person, N.J.S.A. 2C:39-7(b). The police initiated a stop of defendant's car because he did not dim his high beams when necessary. A search of defendant's vehicle uncovered a handgun.

Defendant moved to suppress the gun on the ground that the police conducted an unreasonable search in violation of the New Jersey Constitution. Defendant's sole argument in support of his motion, presented both in a letter brief and oral argument to the trial court, was that the police did not have exigent circumstances to justify a warrantless search of his car under Pena-Flores. Defendant did not challenge the validity of the motor-vehicle stop.

At the suppression hearing, only one witness testified -- Officer Joseph Racite of the Carneys Point Township Police Department. According to Officer Racite, at approximately 2:00 a.m. on December 19, 2012, while providing backup for a motor-vehicle stop on Pennsville Auburn Road, he observed a car pass with its high beams on. Officer Racite explained that a car must dim its high beams "as vehicles approach." Officer Racite pursued and stopped the vehicle, and requested backup. Defendant, the driver, appeared intoxicated and was asked to exit his car. After defendant failed to properly perform field-sobriety and balance tests, Officer Racite arrested him for driving while intoxicated. Defendant was handcuffed and placed in the back of a patrol car. While Racite searched defendant's

5

vehicle for "intoxicants," he found a handgun in the center console.

With Pena-Flores as its guide, the trial court made the following findings: the officer had a right to stop defendant's car based on an "unexpected" occurrence and had probable cause to search for an open container of alcohol, but did not have "sufficient exigent circumstances" to conduct a warrantless search. Accordingly, the court suppressed the handgun.

The Appellate Division granted the State's motion for leave to appeal.

B.

The Appellate Division affirmed the trial court's suppression of the gun "because of the utter absence of any exigency to support the warrantless vehicle search that occurred, and because there was no justification for this motor vehicle stop." State v. Witt, 435 N.J. Super. 608, 610-11 (App. Div. 2014). First, the panel declined to address the State's argument that the exigent-circumstances test in Pena-Flores "should be replaced because it has proved to be unworkable and has led to unintended negative consequences." Id. at 612. The panel explained that, as an intermediate appellate court, it had "no authority to 'replace' Pena-Flores with some other legal principles." Ibid.

Second, in applying Pena-Flores, the panel determined that

the evidence at the suppression hearing did not "suggest[] anything close to an exigency that would permit a motor vehicle search without a warrant." Id. at 613. It emphasized that the stop occurred in the early morning when defendant was driving alone; during the search, defendant was "handcuffed" and "seated in the back of a police vehicle"; and the police had no reason to believe that the object of the search -- "open containers of alcohol" -- would not still be in the car "once a warrant was obtained." Ibid.

Third, the panel agreed with defendant's argument, raised for the first time on appeal, that Officer Racite did not have a "reasonable and articulable suspicion" to stop defendant for violating N.J.S.A. 39:3-60 because the statute requires drivers to dim their high beams only when "'approach[ing] an oncoming vehicle'" within five hundred feet. Id. at 614-16 (quoting N.J.S.A. 39:3-60). The panel reasoned that the officer's vehicle was not an "oncoming vehicle" because it was parked when defendant drove by with active high beams. Id. at 615-16. Because the officer's vehicle was not "in operation and in the lane of traffic opposite to" defendant's car, in the panel's view, Officer Racite had no right to stop him. Ibid.

C.

We granted the State's motion for leave to appeal. State v. Witt, 219 N.J. 624 (2014). We also granted the motions of

7

the Association of Criminal Defense Lawyers of New Jersey, the New Jersey State Bar Association, and the American Civil Liberties Union of New Jersey to participate as amici curiae.

II.

Before addressing the parties' arguments on the constitutional standard governing the search of defendant's vehicle, we dispose of his challenge to the lawfulness of the stop, which was raised for the first time before the Appellate Division. Defendant did not challenge the validity of the motor-vehicle stop under N.J.S.A. 39:3-60 in either his brief or argument before the trial court. Defendant now claims that the mere filing of a motion to suppress under Rule 3:5-7(a) required the State "to justify every aspect of the warrantless search," including the initial stop, which he did not challenge at the suppression hearing.

We reject defendant's contention that the State must disprove issues not raised by the defense at a suppression hearing. Defendant's approach would compel the State to cover areas not in dispute from fear that an abbreviated record will leave it vulnerable if the defense raises issues for the first time on appeal. Requiring the State to disprove shadow issues will needlessly lengthen suppression hearings and result in an enormous waste of judicial resources.

Rule 3:5-7(a) provides that "a person claiming to be

aggrieved by an unlawful search and seizure . . . may apply . . . to suppress the evidence." Defendant never "claim[ed] to be aggrieved by an unlawful" stop. He only challenged the search of his car. A prosecutor should not have to possess telepathic powers to understand what is at issue in a suppression hearing.

N.J.S.A. 39:3-60, in pertinent part, prohibits a driver from using his high beams when he "approaches an oncoming vehicle within five hundred feet." Based on a violation of that statute, Officer Racite stopped defendant's car. Because the defense did not question the validity of the stop at the suppression hearing, the record is barren of facts that would shed light on this issue. For example, the record only discloses that Officer Racite was on the side of the road assisting as backup on a motor-vehicle stop when defendant approached using his high beams. We do not know on which side of the road Officer Racite's patrol car was positioned, whether Racite was in his car facing defendant's vehicle, and whether Racite's car was operational. Importantly, no testimony was elicited whether any other cars were travelling in the opposite lane from defendant at the time because the issue was of no moment.

Generally, "the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review." State v. Robinson, 200 N.J. 1, 19 (2009).

9

Parties must make known their positions at the suppression hearing so that the trial court can rule on the issues before it.  See ibid.  For sound jurisprudential reasons, with few exceptions, "'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'"  Id. at 20 (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

We conclude that it would be unfair, and contrary to our established rules, to decide the lawfulness of the stop when the State was deprived of the opportunity to establish a record that might have resolved the issue through a few questions to Officer Racite.  The trial court, moreover, was never called on to rule on the lawfulness of the stop.  Under the circumstances, the Appellate Division should have declined to entertain the belatedly raised issue.  We therefore reverse the Appellate Division and hold that the lawfulness of the stop was not preserved for appellate review.

We now turn to the parties' arguments, which address whether this Court should continue to follow the standard for automobile searches set forth in Pena-Flores.

### III.

#### A.

The State urges this Court to abandon the exigent-

10

circumstances standard for automobile searches followed in Pena-Flores and to return to the more traditional automobile exception to the warrant requirement articulated in Alston, which allows for the search of a vehicle based on probable cause arising from unforeseeable and spontaneous circumstances. The State argues that the Alston test should be reinstated primarily because (1) the standard governing exigent circumstances under Pena-Flores is too subjective and therefore too susceptible to second-guessing in the judicial process; (2) the standard does not lead to uniform results in the court system; (3) the telephonic-warrant process extends the length of time of a roadway stop, endangering the police and vehicles' occupants from passing traffic; (4) law enforcement has turned not to telephonic warrants -- as the Court expected -- but rather to consent searches, which have a checkered history in New Jersey; and (5) impounding a car to secure a warrant is a greater constitutional intrusion than a prompt search based on probable cause. In short, the State argues that Pena-Flores should be overturned.

### B.

Defendant asserts that, given the doctrine of stare decisis, the State has failed to prove any "special justification" for overturning a well-grounded and well-reasoned recent precedent. Defendant submits that this Court should

11

stand by Pena-Flores because:  (1) the statistical evidence presented by the State suggests that "the system is working well" and will get even better "as the State . . . trains all of its officers on the correct law"; (2) New Jersey's jurisprudence expresses a preference for search warrants, and our "State Constitution provides greater protection than does its federal counterpart"; (3) the exigency rule is simple in concept and application -- "get a warrant, unless circumstances are such that to do so would risk destruction of evidence, or the safety of officers or others"; (4) consent searches do not present a problem provided police officers only make the request when they possess reasonable suspicion; and (5) the exigency "analysis is not an excessive burden to a police officer," and the Pena-Flores test for exigency is not "substantively different than the test" discussed in Alston.  Simply stated, the defense claims that the State has given no reason to depart from Pena-Flores.

### C.

Echoing many of the arguments made by defendant, amici, the American Civil Liberties Union, Association of Criminal Defense Lawyers, and State Bar Association, individually and collectively, call on the Court to keep faith with Pena-Flores. They claim that the State has failed to establish statistically or otherwise any special circumstance for overthrowing the

12

present exigent-circumstance requirement when a warrant to search a car is not procured. They note that advances in technology will allow more timely access to warrants. In addition, the State Bar rejects the notion that "consent searches may be inherently coercive" and finds that the increase in the number of such searches represents a "positive impact" of the Pena-Flores decision. The American Civil Liberties Union acknowledges that consent searches may be coercive but submits that "the potential abuse of consent searches by law enforcement" should not be the basis for excusing police officers from complying with the dictates of Pena-Flores and for allowing warrantless searches without either consent or exigency.

IV.

A.

A critical understanding of Pena-Flores requires that we review the jurisprudential rationales for the automobile-exception to the warrant requirement. Our starting point is the text of our State and Federal Constitutions.

In nearly identical language, Article I, Paragraph 7 of the New Jersey Constitution and the Fourth Amendment of the United States Constitution guarantee that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" and

13

that warrants shall not issue in the absence of "probable cause." N.J. Const. art. I, ¶ 7; U.S. Const. amend. IV. Our jurisprudence under both constitutional provisions expresses a preference that police officers secure a warrant before they execute a search. State v. Frankel, 179 N.J. 586, 597-98, cert. denied, 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004). Warrantless searches are permissible only if "justified by one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." Id. at 598 (quoting Mincey v. Arizona, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 2d 290, 298-99 (1978)). One such exception is the automobile exception to the warrant requirement. Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031, 1036 (1996); see also Alston, supra, 88 N.J. at 230-31 (citing Chambers v. Maroney, 399 U.S. 42, 51, 90 S. Ct. 1975, 1981, 26 L. Ed. 2d 419, 428 (1970)).

The automobile exception to the warrant requirement -- as defined by the United States Supreme Court in construing the Fourth Amendment -- authorizes a police officer to conduct a warrantless search of a motor vehicle if it is "readily mobile" and the officer has "probable cause" to believe that the vehicle contains contraband or evidence of an offense. Labron, supra, 518 U.S. at 940, 116 S. Ct. at 2487, 135 L. Ed. 2d at 1036. Under federal law, probable cause to search a vehicle "alone

14

satisfies the automobile exception to the Fourth Amendment's warrant requirement." Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442, 445 (1999). The federal automobile exception does not require "a separate finding of exigency in addition to a finding of probable cause," ibid., as is the case in New Jersey, Pena-Flores, supra, 198 N.J. at 28.

The United States Supreme Court has identified three rationales for the current automobile exception: (1) the inherent mobility of the vehicle, Carroll v. United States, 267 U.S. 132, 153, 45 S. Ct. 280, 285, 69 L. Ed. 543, 551 (1925); (2) the lesser expectation of privacy in an automobile compared to a home, California v. Carney, 471 U.S. 386, 391-93, 105 S. Ct. 2066, 2069-70, 85 L. Ed. 2d 406, 413-14 (1985); and (3) the recognition that a Fourth Amendment intrusion occasioned by a prompt search based on probable cause is not necessarily greater than a prolonged detention of the vehicle and its occupants while the police secure a warrant, Chambers, supra, 399 U.S. at 51-52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428.

The first rationale is clearly expressed in Carroll, supra, the case in which the United States Supreme Court first recognized the automobile exception. 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543. There, the police stopped a car believed to be used by "bootleggers" to smuggle alcohol in violation of the Prohibition laws. Id. at 160, 45 S. Ct. at 287, 69 L. Ed. at

15

554. The Court upheld the warrantless search because the police possessed probable cause and because "it [was] not practicable to secure a warrant" given that "the vehicle [could have been] quickly moved out of the locality or jurisdiction." Id. at 153, 45 S. Ct. at 285, 69 L. Ed. at 551. The Court noted that, historically, Fourth Amendment jurisprudence had distinguished between searches of structures, such as a house, and readily moveable vehicles, such as a ship or automobile. Ibid.; see also Carney, supra, 471 U.S. at 390, 105 S. Ct. at 2069, 85 L. Ed. 2d at 412 (stating that "capacity to be 'quickly moved' was clearly the basis of the holding in Carroll"). Thus, the vehicle's inherent mobility provided the exigency rationale for the exception to the warrant requirement. Carroll, supra, 267 U.S. at 153, 45 S. Ct. at 285, 69 L. Ed. at 551.

The second rationale is that, due to the pervasive governmental regulation of motor vehicles, an individual is afforded a lesser expectation of privacy in an automobile. Carney, supra, 471 U.S. at 391-93, 105 S. Ct. at 2069-70, 85 L. Ed. 2d at 413-14 (stating that "pervasive schemes of regulation . . . necessarily lead to reduced expectations of privacy" in motor vehicles); Chambers, supra, 399 U.S. at 52, 90 S. Ct. at 1982, 26 L. Ed. 2d at 429 (noting that for "purposes of the Fourth Amendment there is a constitutional difference between houses and cars"). Thus, the Supreme Court has held that, so

16

long as the probable-cause standard is met, the reduced expectation of privacy in a vehicle and its ready mobility justify an exception to the warrant requirement. Carney, supra, 471 U.S. at 391-93, 105 S. Ct. at 2069-70, 85 L. Ed. 2d at 413-14.

The third rationale, and in many ways the most compelling one, is that, for Fourth Amendment purposes, an immediate search of a vehicle may represent a lesser intrusion than impounding the vehicle and detaining its occupants while the police secure a warrant. See Chambers, supra, 399 U.S. at 51-52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428. In Chambers, Justice White, writing for the Court, mused that it was "debatable" whether "the immobilization" of a motor vehicle while the police secured a warrant was a "lesser" or "greater" intrusion than an immediate warrantless search premised on probable cause. Ibid. He concluded that either "seizing and holding a car before presenting the probable cause issue to a magistrate" or "carrying out an immediate search without a warrant" based on probable cause were both "reasonable" courses under the Fourth Amendment. Id. at 52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428.

Across the Supreme Court's jurisprudential spectrum, Justices have hewed to this viewpoint. Justice Marshall, in a dissent joined by Justice Brennan, wrote that "the warrantless search [of an automobile] is permissible because a warrant

17

requirement would not provide significant protection of the defendant's Fourth Amendment interests." United States v. Ross, 456 U.S. 798, 831, 102 S. Ct. 2157, 2176, 72 L. Ed. 2d 572, 598 (1982) (Marshall, J., dissenting). Justice Marshall observed that the process of seizing a car and detaining the driver while securing a search warrant "would be more intrusive than the actual search itself." Ibid. He therefore adhered to the position that "even where police can bring both the defendant and the automobile to the station safely and can house the car while they seek a warrant, the police are permitted to decide whether instead to conduct an immediate search of the car." Ibid. (emphasis omitted).

We are unaware of any contemporary United States Supreme Court Justice, past or present, who has dissented from the current iteration of the federal automobile exception.[1] No

---

[1] In Dyson, supra, although dissenting from the majority's summary reversal of the Maryland Court of Appeals, Justices Breyer and Stevens nonetheless "agree[d] that the Court's per curiam opinion correctly states the law" on the automobile exception. 527 U.S. at 468, 119 S. Ct. at 2014, 144 L. Ed. 2d at 446 (Breyer, J., dissenting). In Labron, supra, Justices Stevens and Ginsburg dissented solely on procedural grounds in that automobile search case. 518 U.S. at 941-42, 116 S. Ct. at 2487-88, 135 L. Ed. 2d at 1036-37 (Stevens, J., dissenting). They believed that the Pennsylvania Supreme Court had rested its decision on its own Constitution, and for that reason the United States Supreme Court should not have exercised its jurisdiction. Ibid. They did not disagree with the majority's description of the federal automobile exception. Ibid.

18

federal case cited by the dissent suggests any wavering over the now well-settled automobile exception.

B.

The overwhelming majority of states have adopted the federal approach to the automobile exception and do not require exigency beyond the inherent mobility of the vehicle.[2]  See

---

[2] See Mewbourn v. State, 570 So. 2d 805, 810 (Ala. Crim. App. 1990); State v. Prasertphong, 75 P.3d 675, 685 (Ariz. 2003); State v. Crane, 446 S.W.3d 182, 186 (Ark. 2014); People v. Chavers, 658 P.2d 96, 101 (Cal. 1983); People v. Hill, 929 P.2d 735, 739 (Colo. 1996); State v. Winfrey, 24 A.3d 1218, 1224 (Conn. 2011); Reeder v. State, 783 A.2d 124 (Del. 2001); State v. Starkey, 559 So. 2d 335, 339 (Fla. Dist. Ct. App. 1990); State v. Lejeune, 576 S.E.2d 888, 892 (Ga. 2003); State v. Tucker, 979 P.2d 1199, 1200 (Idaho 1999); People v. Contreras, 22 N.E.3d 368, 377 (Ill. App. Ct. 2014); Meister v. State, 933 N.E.2d 875, 880 (Ind. 2010); State v. Cain, 400 N.W.2d 582, 585 (Iowa 1987); State v. Conn, 99 P.3d 1108, 1114 (Kan. 2004) Chavies v. Commonwealth, 354 S.W.3d 103, 111 (Ky. 2011); State v. Thompson, 842 So. 2d 330, 336-38 (La. 2003); State v. Melvin, 955 A.2d 245, 250 (Me. 2008); Fair v. State, 16 A.3d 211, 217 (Md. Ct. Spec. App. 2011); Commonwealth v. Motta, 676 N.E.2d 795, 799 (Mass. 1997); People v. Kazmierczak, 605 N.W.2d 667, 672 (Mich. 2000); State v. Gauster, 752 N.W.2d 496, 508 (Minn. 2008); Franklin v. State, 587 So. 2d 905, 907 (Miss. 1991); State v. Burkhardt, 795 S.W.2d 399, 404 (Mo. 1990); State v. Neely, 462 N.W.2d 105, 109-10 (Neb. 1990); State v. Lloyd, 312 P.3d 467, 474 (Nev. 2013); People v. Galak, 616 N.E.2d 842, 844 (N.Y. 1993); State v. Isleib, 356 S.E.2d 573, 576-77 (N.C. 1987); State v. Zwicke, 767 N.W.2d 869, 873 (N.D. 2009); State v. Welch, 480 N.E.2d 384, 387-88 (Ohio), cert. denied, 474 U.S. 1010, 106 S. Ct. 537, 88 L. Ed. 2d 468 (1985); Gomez v. State, 168 P.3d 1139, 1145 (Okla. Crim. App. 2007); State v. Meharry, 149 P.3d 1155, 1157 (Or. 2006); Commonwealth v. Gary, 91 A.3d 102, 138 (Pa. 2014); State v. Werner, 615 A.2d 1010, 1014 (R.I. 1992); State v. Weaver, 649 S.E.2d 479, 482 (S.C. 2007); State v. Sweedland, 721 N.W.2d 409, 412-13 (S.D. 2006); State v. Saine, 297 S.W.3d 199, 207 (Tenn. 2009); State v. Guzman, 959 S.W.2d 631, 634 (Tex. Crim. App. 1998); Duncan v. Commonwealth, 684 S.E.2d 838, 840 (Va. Ct. App. 2009); State v. Tompkins, 423

19

Commonwealth v. Gary, 91 A.3d 102, 133-34 (Pa. 2014) (noting that "most states have adopted the federal automobile exception"). Moreover, a number of states have recently eliminated an exigent-circumstances requirement for automobile searches. See Commonwealth v. Motta, 676 N.E.2d 795, 800 (Mass. 1997); State v. Lloyd, 312 P.3d 467, 474 (Nev. 2013); State v. Zwicke, 767 N.W.2d 869, 873 (N.D. 2009); Gary, supra, 91 A.3d at 138 (Pa.); State v. Werner, 615 A.2d 1010, 1013-14 (R.I. 1992).

The Pennsylvania Supreme Court recently jettisoned its exigent-circumstances standard and adopted the federal automobile exception. Gary, supra, 91 A.3d at 138. Its reasons for doing so were: (1) the "complexity" and "inconsistency" in "decisional law as to what circumstances constitute sufficient danger to the police or the public such that an exigency is present"; (2) the speculative nature of determining whether unknown persons will attempt to tamper with evidence in the vehicle if unguarded; and (3) the Court's inability to articulate "a consistent, clear, understandable, and readily applicable conception of exigency sufficient to support a warrantless vehicular search." Id. at 134-37. The Pennsylvania high court ultimately concluded that it was "difficult, if not impossible, for police officers in the field to determine how

---

N.W.2d 823, 829 (Wis. 1988); Phippen v. State, 297 P.3d 104, 108 (Wyo. 2013).

20

[it] would rule in motor vehicle search and seizure cases, the circumstances of which are almost endlessly variable." Id. at 137.

It is noteworthy that those few states that require exigent circumstances are among the least populous or least densely populated states in the country. See State v. Phillips, 696 P.2d 346, 350 (Haw. 1985); State v. Elison, 14 P.3d 456, 471 (Mont. 2000); State v. Sterndale, 656 A.2d 409, 411 (N.H. 1995); State v. Gomez, 932 P.2d 1, 12 (N.M. 1997); State v. Anderson, 910 P.2d 1229, 1236 (Utah 1996) (plurality); State v. Bauder, 924 A.2d 38, 50 (Vt. 2007); State v. Tibbles, 236 P.3d 885, 888 (Wash. 2010). Those states do not have the same degree of fast-flowing traffic on crowded highways that pose such a special danger to protracted motor-vehicle stops in New Jersey.

C.

At least as of 1981, this Court did not construe the automobile exception under Article I, Paragraph 7 of our State Constitution differently from the federal interpretation under the Fourth Amendment. In Alston, supra, we upheld the constitutionality of the police search of the defendants' car based on the United States Supreme Court's traditional automobile exception to the warrant requirement. 88 N.J. at 235.

In Alston, we expressed approval of the federal template

for the automobile-exception "recognized in Carroll and Chambers."  Id. at 233; see also Paul Stern, Revamping Search-and-Seizure Jurisprudence Along the Garden State Parkway, 41 Rutgers L.J. 657, 669 (2010) ("Historically, the New Jersey Supreme Court aligned its analysis [of the automobile exception] with that of the United States Supreme Court.").  We did not turn to Article I, Paragraph 7 of our State Constitution as a separate source of rights, but instead to Chambers as the controlling law.  Alston, supra, 88 N.J. at 231-35.  We rejected the positions of the defendants and the Appellate Division concerning "the level of 'exigent circumstances'" required for a warrantless automobile search.  In doing so, we stated that "[a]ccording to Chambers, the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile stopped on the highway."  Id. at 233 (emphasis added) (internal citations omitted).  The "unforeseeability and spontaneity" requirement in Alston came from the United States Supreme Court's language in Chambers, supra, which observed that "the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable."  399 U.S. at 50-51, 90 S. Ct.

at 1981, 26 L. Ed. 2d at 428; see Alston, supra, 88 N.J. at 234 (crediting Chambers for this Court's automobile-exception standard).

Significantly, we also made clear in Alston, supra, that merely because "the particular occupants of the vehicle may have been removed from the car, arrested, or otherwise restricted in their freedom of movement," police were not required to secure a warrant. 88 N.J. at 234. Last, relying on Chambers, we emphasized that "when there is probable cause to conduct an immediate search at the scene of the stop, the police are not required to delay the search by seizing and impounding the vehicle pending review of that probable cause determination by a magistrate." Id. at 234-35.

In State v. Martin, 87 N.J. 561, 563-64 (1981), decided the same day as Alston, we again upheld the search of a car based on "the automobile exception as applied by the Supreme Court in Chambers." In that case, a police officer discovered an "unoccupied and parked" station wagon that fit the description of the vehicle used in an armed robbery. Id. at 563-65. The officer peered through the vehicle's rear windows and observed in plain view evidence related to the crime. Id. at 565. The officer had the station wagon towed to headquarters, where it was searched without a warrant. Ibid.

Citing to Chambers, we held that "the circumstances that

23

furnished the officers with probable cause were unanticipated and developed spontaneously." Id. at 570. We also held that "where police have probable cause to believe that [a] vehicle contains contraband or evidence of criminal activity," a warrantless search under the automobile exception is permissible, even if the vehicle is parked and unoccupied. Id. at 567. We restated the principle in Chambers that "when police have probable cause to conduct a warrantless search of an automobile at the spot where the officers encounter the car, they may constitutionally remove the vehicle to police headquarters and there conduct the search without first obtaining a warrant." Id. at 568.

Although not necessary to justify a search pursuant to the automobile exception, the Court listed an independent exigency warranting an immediate search of the vehicle: the suspects in the armed robbery were still at large and "might have returned at any moment to move the car or remove the car's contents." Id. at 569. We affirmed that we were keeping faith with the Chambers paradigm. Id. at 570.

According to one commentator, "[f]ollowing Alston, the state's automobile exception, as it pertained to traffic stops, appeared clear: provided that probable cause arose at the time of the seizure, the search of the automobile was warranted." Stern, supra, 41 Rutgers L.J. at 671.

In State v. Colvin, 123 N.J. 428, 429, 437 (1991), we upheld the warrantless search of a drug suspect's parked car primarily on the basis of a general exigent-circumstances analysis, even though we introduced the issue as one that "concerns the scope of the 'automobile exception.'" In that case, the police arrested the defendant for his role in a suspected drug transaction. Id. at 430. Shortly afterwards, the police were advised by an informant that drugs were stashed in the defendant's car and that his confederates, who were alerted to his arrest, would attempt to remove drugs from the car. Ibid. On that basis, the police conducted a warrantless search of the parked car and recovered cocaine. Ibid. Colvin evidently did not rely on Alston or Martin, or even Chambers, as the primary precedential guide for resolving the search issue. Rather, Colvin relied on Coolidge v. New Hampshire, 403 U.S. 443, 462, 91 S. Ct. 2022, 2036, 29 L. Ed. 2d 564, 580 (1971) (plurality), a case involving the search of a parked car on private property without a valid warrant. Colvin, supra, 123 N.J. at 434-35. The search of the car in Coolidge, supra, was determined to be unconstitutional because the police had known for some time of the car's role in a murder. 403 U.S. at 460, 91 S. Ct. at 2035, 29 L. Ed. 2d at 579. The probable cause in Coolidge did not arise from spontaneous or unforeseeable circumstances.

25

We found in Colvin, supra, that "nearly all of the factors missing in Coolidge were present" to justify a warrantless search: "Any element of surprise had been lost; the vehicle contained the 'contraband' drugs; there were 'confederates waiting to move the evidence'; the police would need 'a special police detail to guard the immobilized automobile.'" 123 N.J. at 434-35 (quoting Coolidge, supra, 403 U.S. at 462, 91 S. Ct. at 2036, 29 L. Ed. 2d at 580). Thus, although the Court repeatedly invoked the nomenclature of the automobile exception in Colvin, the constitutional analysis was primarily based on pure exigent circumstances. Colvin was decided strictly on Fourth Amendment grounds. The Court evidently concluded that its decision was harmonious with federal jurisprudence because Colvin does not once mention our State Constitution as a separate source of rights.

D.

In Cooke, supra, this Court broke ranks with the United States Supreme Court's Fourth Amendment automobile-exception jurisprudence, which held in Labron -- and later again in Dyson -- that "'if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'" 163 N.J. at 665, 671 (quoting Labron, supra, 518 U.S. at 940, 116 S. Ct. at 2487, 135 L. Ed. 2d at 1036); see Dyson, supra, 527 U.S. at

26

467, 119 S. Ct. at 2014, 144 L. Ed. 2d at 445.  Notably, the United States Supreme Court in Labron rejected the Pennsylvania Supreme Court's automobile-exception rule, which permitted warrantless searches when "'unforeseen circumstances involving the search of an automobile are coupled with the presence of probable cause.'"  Cooke, supra, 163 N.J. at 666 (quoting Labron, supra, 518 U.S. at 940, 116 S. Ct. at 2487, 135 L. Ed. 2d at 1035).

Our Court announced for the first time in Cooke that, under Article I, Paragraph 7 of our State Constitution, the warrantless search of a vehicle could only be justified based on exigent circumstances in addition to probable cause.  Id. at 671.

The federal automobile-exception jurisprudence, until Labron, was far from a model of clarity.  Indeed, Labron did not even cite to Chambers as authority, the very case from which we crafted in Alston the requirement that probable cause must arise from unforeseeable and spontaneous circumstances.

In Cooke, however, the Court parted ways not only with the federal automobile-exception standard, but also with its own automobile exception articulated in Alston.  Cooke imposed a full-blown exigency analysis, holding that "exigency in the constitutional context amounts to 'circumstances that make it impracticable to obtain a warrant when the police have probable

27

cause to search the car.'" Id. at 676 (quoting Colvin, supra, 123 N.J. at 437). That approach eliminated any vestige of the automobile exception, even the one we defined in Alston. That exacting exigent-circumstances standard, if faithfully applied, should result in the securing of search warrants in most automobile-search cases -- and probably should have resulted in one even in Cooke.

The exigency requirement in Alston, as the Cooke Court noted, was the "'unforeseeability and spontaneity of the circumstances giving rise to probable cause, and the inherent mobility of the automobile,'" id. at 672 (quoting Alston, supra, 88 N.J. at 233), and "the unanticipated circumstances that give rise to probable cause occur swiftly," ibid. (citing Alston, supra, 88 N.J. at 234). The language in Alston ensured that police officers who possessed probable cause well in advance of an automobile search sought a warrant. Police officers could not sit on probable cause and later conduct a warrantless search, for then the inherent mobility of the vehicle would have no connection with a police officer not procuring a warrant. The Alston standard provided a limited exigency to the warrant requirement.

However, just because the circumstances giving rise to probable cause are unforeseeable and spontaneous does not mean that it is impracticable to secure a warrant. For example, a

28

car may be stopped for speeding, and the officer may smell an overpowering odor of marijuana and then arrest, handcuff, and place the driver in the back of a patrol car. Although the probable cause to search arose in an unforeseeable and spontaneous fashion, the officer under the Cooke exigent-circumstances standard should still obtain a search warrant because there is no danger of evidence tampering if the car is impounded and the occupants secured.

Accordingly, searches that had been permissible under Alston were no longer lawful under Cooke. But the question is whether Cooke gave rise to a practicable and workable standard capable of producing fairly uniform results. We now turn to the facts of Cooke, to which the Court applied its new exigent-circumstances standard.

In Cooke, supra, a police officer conducting surveillance observed the defendant participate in drug transactions and, on one occasion, place suspected drugs in a Ford Escort. 163 N.J. at 662. The defendant and an accomplice drove off in another car, but were stopped by police officers serving as a perimeter team. Ibid. The officers arrested the defendant on an unrelated warrant and detained the accomplice. Id. at 662-63. The officers took from the defendant his keys to the Escort and conducted an on-scene search of the car, which uncovered illicit drugs. Id. at 663.

29

The trial court and Appellate Division both concluded that a search of the Escort was not justified by exigent circumstances. Ibid. This Court, however, reversed on the ground that it would have been impracticable to require the police to obtain a warrant and therefore an immediate search was permissible. Id. at 675. However, the Escort was under continuing surveillance by one officer, and other officers could have impounded the car and secured a search warrant. Id. at 662-63. Viewed in that light, the exigency concerns identified by the Court -- e.g., third parties may have been alerted and removed drugs from the car or the car itself, id. at 675 -- were not real given that the car could easily have been placed under police control.

The finding of exigency in Cooke was questionable. When the driver of a car is arrested, secured by handcuffs, or placed in a patrol vehicle, and the car can be impounded, the procuring of a search warrant would seem practicable in most cases. In contrast, a warrantless search would have been permissible under the Alston standard because the probable cause arose from unforeseeable and spontaneous circumstances.

E.

In Pena-Flores, supra, 198 N.J. at 11, 28, the Court reaffirmed the exigent-circumstances standard enunciated in Cooke, rejecting the State's plea for a return to the Alston

30

paradigm.  The Court declared that "the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant."  Id. at 28.  The Court emphasized that "exigency encompasses far broader considerations than the mere mobility of the vehicle" and that "[e]xigency must be determined on a case-by-case basis" with an evaluation of the totality of circumstances focused on "officer safety and the preservation of evidence."  Id. at 28-29.  The Court stated that in assessing exigency, "[l]egitimate considerations are as varied as the possible scenarios surrounding an automobile stop."  Id. at 29.  The Court then gave examples of the considerations that police officers might take into account in determining exigency:

> the time of day; the location of the stop; the nature of the neighborhood; the unfolding of the events establishing probable cause; the ratio of officers to suspects; the existence of confederates who know the location of the car and could remove it or its contents; whether the arrest was observed by passersby who could tamper with the car or its contents; whether it would be safe to leave the car unguarded and, if not, whether the delay that would be caused by obtaining a warrant would place the officers or the evidence at risk.
>
> [Ibid.]

The Court acknowledged "that exigency assessments are

31

difficult for the officer on the street," but considered "the importance of the rights involved" as a reason for not returning "to a pure Alston analysis." Id. at 33. The Court encouraged the use of telephonic and electronic warrants as a means to meet the constitutional challenges of motor-vehicle stops. Id. at 33-36. The Court maintained that the police should be given "access to an efficient and speedy electronic and telephonic warrant procedure that will be available to them on the scene; that will obviate the need for difficult exigency assessments; and that will guarantee our citizens the protections that the warrant requirement affords." Id. at 36.

To advance that goal, the Court established a Task Force "to address the practical issues involved in obtaining telephonic and electronic warrants" and "make practical suggestions to ensure that technology becomes a vibrant part of our process." Id. at 35.

V.

A.

In the wake of Pena-Flores, this Court created the Supreme Court Special Committee on Telephonic and Electronic Search Warrants, which issued its report in January 2010. Report of the Supreme Court Special Committee on Telephonic and Electronic Search Warrants (2010). In its Report, the Special Committee made a number of observations and recommendations, some of which

32

are relevant to our analysis.

The Special Committee noted that no jurisdiction in the nation "had established statewide procedures for obtaining telephonic search warrants." Id. at 9. The Special Committee specifically addressed the San Diego Search Warrant Project, which was cited in Pena-Flores "in support of the more widespread use of telephonic applications for search warrants." Ibid. The Special Committee commented that "a closer look at the [San Diego project] revealed that only 14 of 122 search warrants were telephonic warrants, and not a single warrant, telephonic or otherwise, was issued solely for the search of an automobile." Ibid. (citing Laurence A. Benner & Charles T. Samarkos, Searching for Narcotics in San Diego: Preliminary Findings from the San Diego Search Warrant Project, 36 Cal. W. L. Rev. 221 (2000)). The Committee reasoned that "the San Diego study did not offer much guidance" for New Jersey roadside stops because "California follows the federal standard regarding warrantless automobile searches." Id. at 10.

The Special Committee expressed concerns about the dangers to police officers and a car's driver and occupants resulting from extended stops "on the sides of heavily-traveled highways and roads" as an officer "engage[s] in seeking a telephonic warrant." Id. at 17. The Committee also recognized that the warrant process might implicate "resource issues" for smaller

33

departments.  Ibid.  The Committee concluded that "safety and police resource concerns dictated" that search-warrant applications "be completed in no more than 45 minutes, with an ideal goal of 30 minutes."  Ibid.

The Committee outlined the steps to be taken in securing a telephonic search warrant when a police officer "believes [that] there is probable cause to search":  (1) the officer must first "contact[] the county's on-duty prosecutor"; (2) the officer and on-duty prosecutor must then "have a discussion regarding whether or not to request a search warrant"; (3) if the prosecutor "believes a search warrant is necessary, the prosecutor, with the police officer still on the connection, contacts the on-duty judge"; (4) the judge must administer an oath to the officer; (5) the officer must "identify himself, state the purpose of the request and present facts supporting the applications"; and (6) the officer must give sworn oral testimony.  Id. at 19.

Given those multiple steps, the question remained whether the Committee's 30- to 45-minute timeframe for securing telephonic search warrants was feasible.

B.

Following the Special Committee's Report, the Administrative Office of the Courts conducted two pilot programs, one in Mercer County and another in Burlington County.

34

See Burlington Vicinage, Telephonic Search Warrants (Pena-Flores) Pilot Program. The Mercer County pilot program lasted only two months, yielding "very few telephonic search warrant applications" and "very little useable data." Id. at 3-4. That prompted the Burlington County pilot program, which ran from September 2011 to March 2012. Id. at 4, 6.

During that period, the State Police and local law-enforcement agencies filed 42 telephonic automobile search-warrant applications in Burlington County. Id. at 6. "The average request for an automobile warrant took approximately 59 minutes," from the inception of the call to its completion. Ibid.

Separately, the State Police reported to the Administrative Office of the Courts that, during the Burlington County pilot program's six-month timeframe, Troop C applied for 16 telephonic search warrants, with the process taking, on average, 1.5 to 2 hours. Id. at 10. The State Police also noted that, since Pena-Flores, its "state-wide consent to search requests r[o]se from approximately 300 per year to over 2500 per year." Ibid. (emphasis omitted). The State Police explained that its "current patrol policy and practice is to exhaust the consent search option prior to making a determination to seek a warrant, telephonic or in-person." Ibid. In the Burlington County project, the State Police obtained the driver's or occupants'

35

consent to search in 95% of the motor-vehicle stops.  Id. at 7.

C.

In State v. Shannon, 210 N.J. 225, 227 (2012), we declined the State's request to revisit Pena-Flores, finding that the motor-vehicle data submitted by the State was insufficient "to establish the 'special justification' needed to depart from precedent."[3]  In the event of a future challenge to Pena-Flores, we invited the parties, including the Attorney General, "to amass and develop a more thorough, statistical record over time relating to motor vehicle stops by the State Police and local authorities."  Ibid.  We indicated that such "information should include, where possible, (a) the total number of motor vehicle stops, (b) the number of warrantless probable cause searches conducted, consent searches requested, consent searches conducted, and vehicles impounded -- both before and after Pena-Flores -- and (c) other relevant information."  Id. at 227-28.

Following Shannon, the Office of Law Enforcement Professional Standards published a report entitled "The Effects of Pena-Flores on Municipal Police Departments."  Second Report: The Effects of Pena-Flores on Municipal Police Departments

---

[3] The Burlington County Study was not before the Court at the time Shannon was decided.

36

(2013).[4]  The Report analyzed statistical data submitted by 103

participating municipal police departments and the State Police

regarding automobile searches before and after the decision in

Pena-Flores.  The one firm conclusion reached by the Office of

Professional Standards was that "after the Pena-Flores decision,

there was a noticeable increase in consent to search requests

for both municipal departments and the State Police; even with

only a slight increase in the number of motor vehicle stops."

Id. at 38.  Indeed, since Pena-Flores, State Police consent

searches surged ten-fold and municipal law enforcement consent

searches increased by two hundred percent.  Id. at 14.[5]  In

---

[4] The second report incorporates all statistical information
contained in the first report.

[5] Automobile Consent Searches Conducted by State Police
      Pre-Pena-Flores        Post-Pena-Flores

|         | April 2008 | April 2009 | April 2010 | April 2011 | April 2012 | April 2013 |
|---------|------------|------------|------------|------------|------------|------------|
| Granted | 19         | 95         | 209        | 229        | 224        | 217        |
| Denied  | 2          | 13         | 13         | 13         | 40         | 10         |

Automobile Consent Searches Conducted by Municipal Departments
      Pre-Pena-Flores        Post-Pena-Flores

|         | April 2008 | April 2009 | April 2010 | April 2011 | April 2012 | April 2013 |
|---------|------------|------------|------------|------------|------------|------------|
| Granted | 96         | 121        | 176        | 228        | 271        | 365        |
| Denied  | 6          | 5          | 6          | 10         | 7          | 22         |

Pena-Flores was decided on February 25, 2009.

Although the number of consent searches by municipal departments
increased by nearly 100 from April 2012 to April 2013, the
Report states that this increase reflects better reporting by
police departments, rather than an increase in the actual number
of consent searches.  Pena-Flores Report, supra, at 15.

37

addition, the statistics reveal that more than 95% of operators or occupants consented to the search of their vehicles. Id. at 14, 19. Overall, in the period after Pena-Flores, the number of municipal automobile searches nearly doubled due to the increased number of consent searches. By contrast, search warrant requests from municipal departments did not increase to a statistically significant level, and those from the State Police have climbed but account for only a fraction of the total number of searches. See id. at 27, 38.[6] At least among municipal departments, the number of non-consent, warrantless searches have remained fairly constant before and after Pena-Flores. Id. at 32.[7]

---

[6] Automobile Search Warrant Requests Made by State Police

Pre-Pena-Flores Post-Pena-Flores

| April 2008 | April 2009 | April 2010 | April 2011 | April 2012 | April 2013 |
|---|---|---|---|---|---|
| 0 | 3 | 13 | 11 | 19 | 32 |

Automobile Search Warrant Requests Made by Municipal Departments

Pre-Pena-Flores Post-Pena-Flores

| April 2008 | April 2009 | April 2010 | April 2011 | April 2012 | April 2013 |
|---|---|---|---|---|---|
| 4 | 8 | 12 | 7 | 7 | 15 |

[7] Warrantless Automobile Searches Based on Probable Cause

Pre-Pena-Flores Post-Pena-Flores

| | April 2008 | April 2009 | April 2010 | April 2011 | April 2012 | April 2013 |
|---|---|---|---|---|---|---|
| Municipal Departments | 141 | 174 | 175 | 157 | 129 | 157 |
| State Police | -- | -- | -- | -- | 2 | 2 |

VI.

The issue before the Court is whether to continue down the path laid by Cooke and reinforced by Pena-Flores, recognizing that Cooke departed from our decision in Alston. The resolution of the issue implicates the doctrine of stare decisis.

Stare decisis promotes consistency, stability, and predictability in the development of legal principles and respect for judicial decisions. See Shannon, supra, 210 N.J. at 226. For that reason, a "special justification" is required to depart from precedent. State v. Brown, 190 N.J. 144, 157-58 (2007) (quoting Dickerson v. United States, 530 U.S. 428, 443, 120 S. Ct. 2326, 2336, 147 L. Ed. 2d 405, 419 (2000)).

Although stare decisis furthers important policy goals, it is not an inflexible principle depriving courts of the ability to correct their errors. Fox v. Snow, 6 N.J. 12, 23 (1950) (Vanderbilt, C.J., dissenting) ("The doctrine of stare decisis [does not] render[] the courts impotent to correct their past errors . . . ."); see also White v. Twp. of N. Bergen, 77 N.J. 538, 550-52 (1978) (noting acceptance of "Vanderbilt thesis"). Experience and further consideration will reveal, at times, that a well-intentioned decision is not furthering the goal it was

---

Prior to April 2012, the State Police did not keep measurable statistics in this category. Pena-Flores Report, supra, at 32.

39

intended to advance. Therefore, "the nature of the judicial process requires the power to revise, to limit, and to overrule if justice is to be done." Shannon, supra, 210 N.J. at 227. Stare decisis is not a command to perpetuate the mistakes of the past. See Lawrence v. Texas, 539 U.S. 558, 577, 123 S. Ct. 2472, 2483, 156 L. Ed. 2d 508, 525 (2003). "Among the relevant considerations in determining whether to depart from precedent are whether the prior decision is unsound in principle [and] unworkable in practice . . . ." Shannon, supra, 210 N.J. at 227.

The United States Supreme Court has not considered stare decisis to be an "inexorable command" to continue down a mistaken jurisprudential path and, accordingly, has reversed itself on a number of occasions. See Lawrence, supra, 539 U.S. at 577-78, 123 S. Ct. at 2483-84, 156 L. Ed. 2d at 525-26 (overturning Bowers v. Hardwick, 478 U.S. 186, 196, 106 S. Ct. 2841, 2846-47, 92 L. Ed. 2d 140, 149 (1986), and striking down statute that made it crime for two persons of same sex "to engage in certain intimate sexual conduct"); see, e.g., Arizona v. Gant, 556 U.S. 332, 351, 129 S. Ct. 1710, 1723-24, 173 L. Ed. 2d 485, 501 (2009) (overturning New York v. Belton, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768, 775 (1981), and redefining when police may search car's passenger compartment incident to arrest); Gideon v. Wainwright,

40

372 U.S. 335, 342-45, 83 S. Ct. 792, 795-97, 9 L. Ed. 2d 799, 804-06 (1963) (overruling Betts v. Brady, 316 U.S. 455, 471, 62 S. Ct. 1252, 1261, 86 L. Ed. 1595, 1606 (1942), and providing counsel to indigent defendants in state prosecutions); Brown v. Bd. of Educ. of Topeka, 347 U.S. 483, 495, 74 S. Ct. 686, 692, 98 L. Ed. 873, 881 (1954) (overruling Plessy v. Ferguson, 163 U.S. 537, 548, 16 S. Ct. 1138, 1142, 41 L. Ed. 256, 260 (1896), and striking down "separate but equal" doctrine).

The High Court also has not permitted an incorrect decision to linger merely because it was of recent origin. See, e.g., W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187, 87 L. Ed. 1628, 1639-40 (1943) (overturning Minersville Sch. Dist. v. Gobitis, 310 U.S. 586, 600, 60 S. Ct. 1010, 1015-16, 84 L. Ed. 1375, 1382 (1940), and holding that schoolchildren cannot be compelled to salute flag or recite Pledge of Allegiance); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113, 132 L. Ed. 2d 158, 182 (1995) (overturning Metro Broad., Inc. v. Fed. Commc'ns Comm'n, 497 U.S. 547, 596-97, 110 S. Ct. 2997, 3026, 111 L. Ed. 2d 445, 483 (1990), and holding that all racial classifications made by government actors must undergo strict scrutiny analysis).

In light of those principles, we now discuss whether Pena-Flores is furthering the constitutional values that are protected by Article I, Paragraph 7 of the New Jersey

41

Constitution and whether there is "special justification" for departing from it.

VII.

A.

Clearly, the use of telephonic search warrants has not resolved the difficult problems arising from roadside searches, as the Court expected when it decided Pena-Flores. The Supreme Court Special Committee on Telephonic and Electronic Search Warrants was greatly concerned about the safety of police officers and a car's driver and occupants detained on the side of a heavily traveled highway or road while a telephonic warrant is secured. The Committee set a time limit for the completion of such search-warrant applications: "no more than 45 minutes, with an ideal goal of 30 minutes." Supreme Court Telephonic Warrants Report, supra, at 17. Nevertheless, nearly three years after Pena-Flores, the Burlington County project commissioned by the Administrative Office of the Courts found that the average time for obtaining a telephonic warrant was 59 minutes, and the State Police reported that Troop C experienced times of between 1.5 and 2 hours in the warrant-application process. Pena-Flores Pilot Program, supra, at 6, 10. The hope that technology would reduce the perils of roadside stops has not been realized. Prolonged encounters on the shoulder of a crowded highway -- even within the range of 30 to 45 minutes -- may pose an

42

unacceptable risk of serious bodily injury and death.  News

reports reveal the carnage caused by cars and trucks crashing

into police officers and motorists positioned on the shoulders

of our highways.[8]

The dramatic increase in the number of consent searches

since Pena-Flores is apparently an unintended consequence of

that decision.  With hindsight, the explanation becomes clearer.

Consent searches avoid the dangers of protracted roadway stops

while search warrants are procured, and they remove the legal

unpredictability surrounding a warrantless search based on the

complex of factors detailed in Pena-Flores.  We are not as

sanguine as defendant and amici about the benefits of consent

searches in such great numbers.

Not long ago, the State Police subjected minority motorists

---

[8] See, e.g., Steph Solis, Seaside Heights Man Charged with DWI After Crashing into Brick Patrol Car, Asbury Park Press, June 26, 2015, at 9A (police officer hospitalized after intoxicated driver crashed into his patrol car during course of traffic stop); Abbott Koloff, School Van Driver Dies in GSP Accident, Bergen Record, July 24, 2014, at L-2 (man killed, two others injured, when vehicle struck car and three pedestrians on Parkway grassy median); Stephen Stirling, Two Officers Injured in Roadside Accident, Star-Ledger, July 20, 2014, at 17 (two police officers injured, one suffering broken ribs and "severe cuts to the head and face," after driver crashed into two patrol cars during traffic stop); Stefanie Dazio & Christopher Maag, Driver Charged in Crash that Killed Cop, Bergen Record, July 18, 2014, at A-1 (police officer killed while operating radar on shoulder when rear-ended by tractor-trailer); Monroe Officer Hit by SUV, Injured, Courier-Post, June 24, 2014, at 4A (police officer suffered broken leg and knee injury after intoxicated driver crashed into him during course of traffic stop).

to consent searches on a grossly disproportionate basis because of racial profiling.  Attorney General, Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling, at 27, 30 (1999), available at http://www.state.nj.us/lps/intm_419.pdf.  As a result of the abuse of consent searches, the State Police were placed under the supervision of federal monitors pursuant to a consent decree.  See State v. Herrerra, 211 N.J. 308, 325 (2012) (discussing consent decree).  "After two independent monitors reported substantial and uninterrupted compliance for the forty-five months from early 2004 through December 2007, and after a series of public hearings conducted by the Advisory Committee on Police Standards, a federal judge granted the parties' joint application for termination of the consent decree."  Ibid.

Statistical data accumulated from the federal monitors' reports indicated that "nearly ninety-five percent of detained motorists granted a law enforcement officer's request for consent to search."  State v. Carty, 170 N.J. 632, 644-45 (2002) (citing Monitors' Second Report:  Long-term Compliance Audit, at 8 (Jan. 2001); Monitors' Third Report:  Long-term Compliance Audit, at 8 (Apr. 2001); Monitors' Fourth Report:  Long-term Compliance Audit, at 8 (July 2001)).  The federal reports' finding that 95% of motorists accede to requests for consent to search is confirmed by more recent reports.  See Pena-Flores

44

Pilot Program, supra, at 7; Pena-Flores Report, supra, at 14, 19.

Given the widespread abuse of consent searches, this Court in Carty forbade police officers from making consent-search requests unless they had reasonable and articulable suspicion to believe a vehicle contained contraband or evidence of an offense. Id. at 647. Still, that standard does not remove the coercive effect of a search request made to a motorist stopped on the side of a road. We recognized in Carty "the inherently coercive predicament of the driver who is stopped on the highway and faced with the perceived choice of either refusing consent to search and therefore increasing the likelihood of receiving a traffic summons, or giving consent to search in the hope of escaping with only a warning." State v. Domicz, 188 N.J. 285, 306 (2006). Under those and other like circumstances, "it is not a stretch of the imagination to assume that the individual feels compelled to consent." Carty, supra, 170 N.J. at 644.

To be sure, consent searches are permissible if not abused. Nevertheless, when it decided Pena-Flores, the Court did not expect that the rejection of the automobile exception would lead to police dependency on consent searches. We also must be mindful that consent searches may be made on less than probable cause and that after Pena-Flores the number of searches conducted by municipal police officers nearly doubled due to the

45

increased number of consent searches.

We are not willing to conclude that the increase in consent searches after Pena-Flores is serendipitous.

B.

Law enforcement's new-found reliance on consent searches, in part, is an apparent reflection of the difficulty presented to police officers by the Pena-Flores multi-factor exigent-circumstances standard. Under that standard, before conducting a warrantless roadside search, police officers must take into account a dizzying number of factors. Pena-Flores, supra, 198 N.J. at 29. These factors leave open such questions as "what is the acceptable ratio of officers to suspects, what should the officer know about the neighborhood, how is he to know if confederates are skulking about, and what does it mean to consider leaving the car unguarded when the car can be safely towed and impounded?" Id. at 47 (Albin, J., dissenting). The statistics suggest that the Pena-Flores exigency formula has left "many police officers with an unwillingness to hazard a guess, fearing that a mistaken decision will result in the suppression of critical evidence." See ibid. For a law enforcement officer responding to rapidly evolving events on the side of a road, the exigency formula requires the processing of such confounding and speculative information that we cannot expect uniform and consistent decision-making. Thus, searches

based on the Pena-Flores factors must inevitably "lead to widely divergent outcomes and allow trial courts and appellate courts routinely to second-guess the officers on the scene and eventually themselves." Ibid.

This is the very conclusion reached by the Pennsylvania Supreme Court, which recently abandoned its own multi-factor exigency analysis for warrantless searches of automobiles. In Gary, supra, the Pennsylvania high court expressed that its exigency requirement "is a difficult standard to apply, not just for the court, but also, and more importantly, for police officers operating in the field, often in the midst of a fast-moving investigation." 91 A.3d at 135. The court also detailed the inconsistent judicial outcomes emanating from its exigency standard. Id. at 135-36. In adopting the federal automobile exception, the Gary Court acknowledged the futility of its own standard because exigency "can turn on small facts in the midst of a complex, volatile, fast-moving, stressful, and potentially threatening situation in the field." Id. at 134.

The dissent in Pena-Flores, supra, wrongly predicted that our exigency standard would lead prudent police officers to impound cars and detain their occupants while securing a warrant, 198 N.J. at 47 (Albin, J., dissenting); instead, those risk-averse police officers have responded with an explosion of consent searches.

47

C.

In Pena-Flores, the Court stated that, in determining exigency, the fundamental inquiry is "[h]ow the facts of the case bear on the issues of officer safety and the preservation of evidence." Id. at 28-29 (majority). However, as the State submits, typically, "police officers will not search a vehicle at roadside until the situation is under control," that is, "a vehicle will not be searched until that search can be done safely." If an automobile's occupants are secured or detained so that they cannot destroy evidence or gain access to a weapon, the exigency to search the vehicle is illusory and, by all rights, a warrant should be secured. Accepting this reality means that, for the most part, warrantless roadside searches will not occur -- unless done by consent. That logic is dictated by our decision in State v. Eckel, 185 N.J. 523, 524 (2006).

In Eckel, we held that the warrantless search of an automobile is impermissible under the search-incident-to-arrest exception once a vehicle's driver or occupant has been arrested, removed, and secured. Id. at 541. We identified the two justifications for the search-incident-to-arrest exception -- "the protection of the police and the preservation of evidence," id. at 524, the very same factors identified as bearing on exigency to conduct a probable-cause warrantless search of a

48

car, Pena-Flores, supra, 198 N.J. at 28-29. In Eckel, supra, we determined that police safety and evidence preservation are not a basis for a vehicle search incident to an arrest when a person "effectively is incapacitated." 185 N.J. at 524. The same must be true in the case of a warrantless search of a car predicated on probable cause.

Accordingly, the routine police-citizen roadside encounter is unlikely to involve a genuine exigency that will lead to a warrantless search absent consent.

### D.

The current approach to roadside searches premised on probable cause -- "get a warrant" -- places significant burdens on law enforcement. On the other side of the ledger, we do not perceive any real benefit to our citizenry by the warrant requirement in such cases -- no discernible advancement of their liberty or privacy interests. When a police officer has probable cause to search a car, is a motorist better off being detained on the side of the road for an hour (with all the accompanying dangers) or having his car towed and impounded at headquarters while the police secure a warrant? Is not the seizure of the car and the motorist's detention "more intrusive than the actual search itself"? See Ross, supra, 456 U.S. at 831, 102 S. Ct. at 2176, 72 L. Ed. 2d at 598 (Marshall, J., dissenting). At the very least, which is the greater or lesser

49

intrusion is debatable, as Justice White observed in Chambers, supra, 399 U.S. at 51-52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428. For that reason, the United States Supreme Court has concluded that "carrying out an immediate search without a warrant" based on probable cause is "reasonable" under the Fourth Amendment. Id. at 52, 90 S. Ct. at 1981, 26 L. Ed. 2d at 428. We reach the same conclusion under Article I, Paragraph 7 of the New Jersey Constitution, subject to the caveats in Alston.

Although we believe that the exigent-circumstances standard set forth in Cooke and Pena-Flores is unsound in principle and unworkable in practice, we do not adopt the federal standard for automobile searches because that standard is not fully consonant with the interests embodied in Article I, Paragraph 7 of our State Constitution.

VIII.

In Alston, supra, we held that the automobile exception authorized the warrantless search of an automobile only when the police have probable cause to believe that the vehicle contains contraband or evidence of an offense and the circumstances giving rise to probable cause are unforeseeable and spontaneous. 88 N.J. at 233. In articulating that standard, we believed we were merely following the test set forth by the United States Supreme Court in Chambers. Labron and Dyson make clear that

even an unforeseeability and spontaneity requirement is not part of the federal automobile exception.

Here, we part from the United States Supreme Court's interpretation of the automobile exception under the Fourth Amendment and return to the Alston standard, this time supported by Article I, Paragraph 7 of our State Constitution. Alston properly balances the individual's privacy and liberty interests and law enforcement's investigatory demands. Alston's requirement of "unforeseeabilty and spontaneity," id. at 233, does not place an undue burden on law enforcement. For example, if a police officer has probable cause to search a car and is looking for that car, then it is reasonable to expect the officer to secure a warrant if it is practicable to do so. In this way, we eliminate the concern expressed in Cooke, supra -- the fear that "a car parked in the home driveway of vacationing owners would be a fair target of a warrantless search if the police had probable cause to believe the vehicle contained drugs." 163 N.J. at 667-68. In the case of the parked car, if the circumstances giving rise to probable cause were foreseeable and not spontaneous, the warrant requirement applies.

We adopt this approach under our State Constitution because it is a reasonable accommodation of the competing interests between the individual's right to be free from unreasonable searches and law enforcement's investigatory demands. "[W]e

51

have not hesitated to find that our State Constitution provides our citizens with greater rights . . . than those available under the United States Constitution." Lewis v. Harris, 188 N.J. 415, 456 (2006). On many occasions, "this Court has found that the State Constitution provides greater protection against unreasonable searches and seizures than the Fourth Amendment." State v. Earls, 214 N.J. 564, 584 (2013) (citing State v. Reid, 194 N.J. 386, 389 (2008) (recognizing reasonable expectation of privacy in Internet subscriber information); State v. McAllister, 184 N.J. 17, 19 (2005) (finding reasonable expectation of privacy in bank records); State v. Mollica, 114 N.J. 329, 344-45 (1989) (finding privacy interest in hotel-room telephone toll billing records); State v. Novembrino, 105 N.J. 95, 159 (1987) (declining to find good-faith exception to exclusionary rule); State v. Hunt, 91 N.J. 338, 345 (1982) (finding privacy interest in telephone toll billing records)). We make that same finding here in hewing once again to the Alston standard.

We also part from federal jurisprudence that allows a police officer to conduct a warrantless search at headquarters merely because he could have done so on the side of the road. See Chambers, supra, 399 U.S. at 52, 90 S. Ct. at 1981-82, 26 L. Ed. 2d at 428-29. "Whatever inherent exigency justifies a warrantless search at the scene under the automobile exception

52

certainly cannot justify the failure to secure a warrant after towing and impounding the car" at headquarters when it is practicable to do so.  Pena-Flores, supra, 198 N.J. at 39 n.1 (Albin, J., dissenting).  Warrantless searches should not be based on fake exigencies.  Therefore, under Article I, Paragraph 7 of the New Jersey Constitution, we limit the automobile exception to on-scene warrantless searches.[9]

IX.

Today's decision is a new rule of law that we apply purely prospectively because to do otherwise would be unfair and potentially offend constitutional principles that bar the imposition of an "ex post facto law."  U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3.

The United States Constitution and the New Jersey Constitution both prohibit the State Legislature from passing an "ex post facto law."  U.S. Const. art. I, § 10; N.J. Const. art. IV, § 7, ¶ 3.  The Ex Post Facto Clause applies equally to laws that emanate from judicial decisions.  Bouie v. Columbia, 378 U.S. 347, 353-54, 84 S. Ct. 1697, 1702, 12 L. Ed. 2d 894, 900 (1964) ("If a state legislature is barred by the Ex Post Facto

---

[9] We do not suggest that under appropriate circumstances an inventory of a car at headquarters cannot be undertaken pursuant to State v. Slockbower, 79 N.J. 1 (1979), and State v. Ercolano, 79 N.J. 25 (1979), or that the police cannot undertake a search based on a true exigency.

Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.").

The Ex Post Facto Clause proscribes "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive." Calder v. Bull, 3 U.S. (3 Dall.) 386, 390-91, 1 L. Ed. 648, 650 (1798). "Every law that takes away, or impairs, rights vested, agreeably to existing laws, is retrospective, and is generally unjust, and may be oppressive . . . ." Id. at 391, 1 L. Ed. at 650.

Under Pena-Flores, the applicable law at the time of the motor-vehicle stop in this case, the police officer who arrested defendant on suspicion of driving while intoxicated did not have exigent circumstances to search the car for opened bottles of alcohol, according to the factual findings of the trial court, which were affirmed by the Appellate Division. We must defer to those findings because they are supported by sufficient credible evidence in the record. See State v. Elders, 192 N.J. 224, 243-44 (2007). We acknowledge that a different outcome might be reached under the Alston standard. However, because Alston is a new rule of law applied prospectively we need not address that

54

issue.

                              X.

        For the reasons expressed, the exigent-circumstances test

in Cooke and Pena-Flores no longer applies.  We return to the

standard set forth in Alston for warrantless searches of

automobiles based on probable cause.  Going forward, searches on

the roadway based on probable cause arising from unforeseeable

and spontaneous circumstances are permissible.  However, when

vehicles are towed and impounded, absent some exigency, a

warrant must be secured.

        This decision is a new rule of law and will be given

prospective application from the date of this opinion.  For

purposes of this appeal, Pena-Flores is the governing law.

Accordingly, we affirm the judgment of the Appellate Division,

which upheld the suppression of evidence in this case.  Though

it does not change the outcome, we add that the Appellate

Division erred in addressing the validity of the motor-vehicle

stop because that issue was not raised before the trial court.

        We remand for proceedings consistent with this opinion.


        CHIEF JUSTICE RABNER and JUSTICES PATTERSON, FERNANDEZ-
VINA, AND SOLOMON join in JUSTICE ALBIN's opinion.  JUSTICE
LaVECCHIA filed a separate, dissenting opinion, in which JUDGE
CUFF (temporarily assigned) joins.


                              55

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

WILLIAM L. WITT,

    Defendant-Respondent.


    JUSTICE LaVECCHIA, dissenting.

    Persistence has paid off.

    This is not the first time that the State has sought to have the decision in State v. Pena-Flores, 198 N.J. 6 (2009), revisited and overturned.  Pena-Flores reaffirmed State v. Cooke, 163 N.J. 657 (2000), which held that our state constitutional law requires that exigency remain part of the analysis when reviewing law enforcement's purported justification for searching a car in New Jersey without a warrant authorized by a neutral magistrate.  Both cases held that exigency is a necessary component for a warrantless search of a car stopped roadside anywhere in New Jersey -- in the suburbs, on a city street, in a parking lot, or on the highways and rural byways of New Jersey.  The State does not want to have to show exigency.  It wants a relatively automatic exception to

1

the general warrant requirement when it comes to cars, so long as the police encounter leading to the search is spontaneous and unforeseen.  But that argument was rejected in both Pena-Flores and Cooke.  Hence this persistence in having those decisions revisited.

The State brought petitions for certification raising the issue several times.  The issue was certified as an appeal for the State in State v. Deshazo, 208 N.J. 370 (2011), and again in State v. Crooms, 208 N.J. 371 (2011).  Those appeals were consolidated with the State's appeal in State v. Shannon, 208 N.J. 381 (2011), and they were dismissed, collectively, as improvidently granted in an Order carrying a lead caption from State v. Shannon, 210 N.J. 225 (2012).

Our Order in Shannon reminded the State of its burden to show special justification when seeking to upend settled law. Id. at 226-27.  We found no support in the Shannon record for the special-justification finding essential for the Court to consider departing from standing precedent.  Id. at 227.  We took the remarkable step in Shannon of identifying the type of record that the State would have to present to support its requested overturning of decided case law protective of citizens' constitutional right to be free from warrantless searches of their vehicles.  Id. at 227-28.

2

Now the State, through the Attorney General, is back again asking that Pena-Flores be overturned.  I still find no special justification to support the dramatic action the State would have this Court take.  Let me be clear as to what the State seeks and what I decline to do:  I would not overturn Pena-Flores and Cooke and the three decades of precedent on which those decisions rely.

The Court's decision today represents a radical change in our jurisprudence.  It lessens the protection from warrantless searches of automobiles that New Jersey historically has provided.

The majority adopts an automobile exception that rejects the need to show that exigency makes impracticable obtaining a warrant issued by a neutral magistrate.  The majority says that determining exigency is just too difficult -- notwithstanding that police frequently are called on to make exigency determinations in search settings[1] -- and decrees that there no longer will be any requirement of demonstrating exigency for

---

[1] See, e.g., State v. Reece, ___ N.J. ___, ___-___ (2015) (slip op. at 17-19) (noting exigency required for application of emergency-aid doctrine); State v. Walker, 213 N.J. 281, 295-98 (2013) (noting exigent circumstances justifying warrantless arrest); State v. Edmonds, 211 N.J. 117, 130-41 (2012) (emphasizing need for exigency showing in community caretaking cases).

roadside searches of stopped vehicles occurring <u>anywhere</u> in the State of New Jersey. By eliminating the exigency requirement, the majority mimics the federal standard -- a question we were forced to confront in <u>Cooke</u> and which we as a Court rejected as constitutionally insufficient in this State.

The State has not won because it has proved special justification. It has failed in that showing. Indeed, the State's argument demonstrates seeming recognition of that failure by shifting from attempting to prove that obtaining telephonic warrants is impracticable to a new worry about a self-created "problem" associated with an increase in roadside consent searches. Instead of asking people for consent, the Attorney General wants this Court to simply allow searches of cars roadside based on an officer's unreviewed belief that probable cause exists. Further, although the State can create a program under which troopers on the road wear body cameras,[2] it for some reason cannot obtain telephonic warrants, despite the

---

[2] <u>See</u> Samantha Marcus, <u>Body Cams Coming to a Cop Near You as N.J. Pledges Millions to Equip Officers</u>, NJ.com (July 28, 2015), http://www.nj.com/politics/index.ssf/2015/07/body_cams_coming_to_a_cop_near_you_as_nj_pledges_millions_to_equip_officers.html; Office of the Attorney General, <u>Attorney General Law Enforcement Directive No. 2015-1</u> (July 28, 2015), <u>available at</u> http://www.state.nj.us/lps/dcj/agguide/directives/2015-1_BWC.pdf.

4

fact that telephonic warrants are used in many other settings. And a majority of our present Court now accepts those arguments.

This is not a proud day in the history of this Court. Through perseverance in seeking the reversal of a disliked decision with which the State made desultory, if any, effort to comply, the Attorney General has been rewarded on the basis of a wholly inadequate and unpersuasive record. Indeed, that reward is a direct result of the Attorney General's persistence leading to a majority now willing to effect this jurisprudential change.

Ironically, the majority takes this step at a time when federal jurisprudence is veering away from any per se categories of assumed exigency. The arc of history may prove embarrassing indeed for my colleagues in the majority. I must respectfully and vigorously dissent. In my view, stare decisis should prevail.

I.

Stare decisis is the presumed course because it "ensure[s] that the law will not merely change erratically, but will develop in a principled and intelligible fashion[,] . . . [and because it] permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals." Vasquez v. Hillery, 474 U.S. 254, 265, 106 S. Ct. 617, 624, 88 L. Ed. 2d 598, 610 (1986). "Stare decisis 'carries such persuasive force that we have always required a departure

5

from precedent to be supported by some special justification.'" Luchejko v. City of Hoboken, 207 N.J. 191, 208 (2011) (quoting State v. Brown, 190 N.J. 144, 157 (2007)).  When determining whether stare decisis must yield, relevant considerations include "whether the prior decision is unsound in principle[] [or] unworkable in practice."  Shannon, supra, 210 N.J. at 227 (citation omitted).

As to the first consideration, the majority fashions a revisionist view of prior law to conclude that Pena-Flores and Cooke were unsound in principle.  The majority's sweeping review of that prior jurisprudence is unsurprising; its outline was set forth in the dissent to Pena-Flores and became the State's mantra.  That drumbeat to undo decades of case law has led to the crescendo of reversal accomplished today.  However, the history of our jurisprudence requires another, more discerning look to fully appreciate what the majority does here.  Thus, I will turn first to the assertion that Cooke, and necessarily Pena-Flores, are "unsound in principle."  Second, I will address the State's failure to carry its burden to demonstrate that our current law is "unworkable in practice."

II.

In Cooke, this Court dealt directly with the question of the role of exigency in automobile searches -- a question this Court was required to answer following the United States Supreme

6

Court's decision in Pennsylvania v. Labron, 518 U.S. 938, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996) (per curiam). In Labron, the Court rejected an interpretation of the Fourth Amendment that would necessitate a demonstration of the presence of exigent circumstances before officers conducted an automobile search under the federal automobile exception to the general warrant requirement. Id. at 938-40, 116 S. Ct. at 2486, 135 L. Ed. 2d at 1035-36. The Supreme Court held that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Id. at 940, 116 S. Ct. at 2487, 135 L. Ed. 2d at 1036 (citation omitted); see also Maryland v. Dyson, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014, 144 L. Ed. 2d 442, 445 (1999) (per curiam) (confirming that "the 'automobile exception' has no separate exigency requirement").

"In view of those recent federal holdings," this Court said in Cooke, supra, that we were forced to "decide whether the automobile exception requires a finding of exigent circumstances under the New Jersey Constitution." 163 N.J. at 666 (emphasis added). Based on our jurisprudence, we answered that question in the affirmative; for purposes of our own state constitutional analysis, we rejected adoption of the Labron Court's elimination of an exigent-circumstances component under the federal automobile exception. Id. at 670.

In reaching that decision, this Court noted that it "has repeatedly looked to exigent circumstances to justify warrantless automobile searches." Id. at 667 (citing State v. Colvin, 123 N.J. 428, 429 (1991); State v. Esteves, 93 N.J. 498, 504 (1983); State v. Alston, 88 N.J. 211, 233 (1981); State v. Martin, 87 N.J. 561, 569 (1981); State v. Patino, 83 N.J. 1, 9 (1980); State v. LaPorte, 62 N.J. 312, 316 (1973)). To substantiate that statement, the Court provided a detailed discussion of three cases: "In prior cases, such as Alston, Martin, and LaPorte, we held that the warrantless automobile searches were reasonable only because they were supported by probable cause and exigent or emergent circumstances." Id. at 668 (emphasis added).

Alston, supra, involved police pursuit of a speeding vehicle during which the officers noticed that the vehicle's occupants were acting furtively in an apparent attempt to conceal something. 88 N.J. at 216. Once stopped, police requested credentials. Ibid. When one occupant opened the glove compartment to retrieve those credentials, police observed shotgun ammunition. Ibid. The vehicle's occupants were instructed to exit the vehicle and were frisked, but no weapons were found on them. Ibid. However, police observed a bag protruding from underneath the front passenger seat, concealing what the detective determined to be a shotgun. Id. at 216-17.

8

After the suspects were arrested based on the shotgun and ammunition already found, a further search yielded two additional weapons. Id. at 217. This Court upheld the extended search, "find[ing] that under the circumstances of th[e] case the detectives had probable cause to conduct the search of the passenger compartment that revealed the two [additional weapons]," id. at 232, and that "the exigent circumstances that justify the invocation of the automobile exception are the unforeseeability and spontaneity of the circumstances giving rise to probable cause and the inherent mobility of the automobile stopped on the highway," id. at 233 (citation omitted).

As the Cooke Court emphasized, "[w]e upheld the search [in Alston] because the events leading up to the search were spontaneous and unforeseeable, and posed a potential threat to officer safety. Thus, there were exigent circumstances to justify the warrantless search." Cooke, supra, 163 N.J. at 668 (emphasis added) (internal citation omitted) (citing Alston, supra, 88 N.J. at 234).

In Martin, supra, decided the same day as Alston, our Court upheld the warrantless search of a vehicle at a police station. 87 N.J. at 570-71. In that case, officers were investigating a "freshly-committed armed robbery" and were provided with a description of an automobile believed to be operated by the

9

perpetrators of that robbery. See id. at 563. Officers located a vehicle matching the given description, conducted a brief search and credentials check, and allowed the car to proceed on its way. Id. at 564-65. However, at supervisor direction, officers re-located the now-unoccupied vehicle in a housing project parking lot. Id. at 565. The vehicle was identified by two witnesses as the vehicle associated with the armed robbery and was brought to the police station and searched, revealing incriminating evidence of the robbery under investigation. Ibid. In finding the warrantless search constitutionally permissible, and that it would have been dangerous for the officers to have conducted it at the parking lot where the vehicle was found, this Court noted:

> The occupants of the car, the suspected robbers, were still at large. Because the police had stopped the car, the occupants were alerted that they might have been suspected of involvement in the armed robbery. They might have returned at any moment to move the car or remove the car's contents. In addition, the officers had reason to believe that the occupants of the station wagon were not only alerted but also armed and dangerous. The illumination in the parking lot where the vehicle was discovered at that early morning hour was dim at best. In view of the possibility of the suspects' return to the car, "[a] careful search at that point was impractical and perhaps not safe for the officers . . . ."
>
> [Id. at 569-70 (alteration in original) (citations omitted).]

The Court also emphasized the ongoing nature of the investigation of the nearby armed robbery, which heightened the level of exigency, noting that it created "an urgent, immediate need for the police to ascertain whether the car contained evidence of the armed robbery, before the suspects had an opportunity to leave the area or to destroy or dispose of other evidence." Id. at 570 (citation omitted).

In Cooke, supra, the Court quoted in full the above passage from Martin, preceding that quote with the following: "Finding exigent circumstances, we upheld the warrantless search in Martin." 163 N.J. at 669 (emphasis added). The Cooke Court also highlighted the "'urgent, immediate need'" identified by the Martin Court. Ibid. (quoting Martin, supra, 87 N.J. at 570).

In LaPorte, supra, the defendant contended that the warrantless search of his automobile at police headquarters, following his arrest for armed robbery, was illegal. 62 N.J. at 316. The Court rejected the defendant's argument, specifically noting that the "vehicle was mobile," that "[h]ad the police not seized [the vehicle] it might have been moved and whatever evidence it contained lost," that the defendant's "ex-wife had a duplicate key to the car and drove it quite a bit," and that "it was not practicable to secure a warrant." Id. at 317. According to the Cooke Court, "the circumstances [in LaPorte]

11

made it impracticable for the police to procure a search warrant and immediate action was necessary." Cooke, supra, 163 N.J. at 670 (citing LaPorte, supra, 62 N.J. at 316).

In discussing each of those cases -- Alston, Martin, and LaPorte -- the unanimous Cooke Court pointed out the factual features that presented exigency: reasons associated with either police safety or prevention of loss or destruction of evidence. Id. at 668, 669, 670. Such considerations were highlighted as essential parts of this Court's past holdings supporting warrantless searches of automobiles. See ibid.

Following its review of those as well as other past decisions,[3] the Court in Cooke stated:

> In view of our unwavering precedent and the important rights at stake, we see no need to modify our jurisprudence. Stated differently, the State has provided no compelling basis for us to curtail or eliminate those standards that for decades have served the criminal justice system, and served it well, balancing constitutional guarantees against the need for effective law enforcement. . . .

---

[3] Included in that discussion was Colvin, supra, 123 N.J. 428. The majority diminishes Colvin by characterizing it as a decision "primarily based on pure exigent circumstances," ante at ___ (slip op. at 26), even while acknowledging that the Colvin Court "introduced the issue as one that 'concerns the scope of the automobile exception,'" ante at ___ (slip op. at 25) (quoting Colvin, supra, 123 N.J. at 429) (internal quotation marks omitted). Contrary to the majority's portrayal, Colvin is in line with our past precedent and its analysis consistent with our requirement that exigent circumstances must be present to apply the automobile exception in New Jersey.

> [T]he lessened privacy expectation is one factor, which, when combined with the existence of probable cause and the overall exigency of the situation, may justify [a] warrantless search.
>
> [Id. at 670 (emphasis added) (citations omitted).]

Then, in Pena-Flores, supra, this Court "reaffirm[ed] our longstanding precedent that permits an automobile search without a warrant only in cases in which the police have both probable cause to believe that the vehicle contains evidence and exigent circumstances that would justify dispensing with the warrant requirement." 198 N.J. at 11. The Pena-Flores Court again engaged in a detailed discussion of the case law leading up to Cooke, id. at 20-24 -- which the Pena-Flores Court reminded us "affirmed that the exigency inquiry has always been a part of New Jersey's automobile exception," id. at 25-26 (citing Cooke, supra, 163 N.J. at 667, 670-71) -- and emphasized how this Court, unlike the federal courts, has always assessed exigency on a case-by-case basis, rather than solely on the inherent mobility of the automobile, id. at 21.

The Pena-Flores Court highlighted LaPorte as the first indication that, unlike the developing federal law, specific facts create exigency, not the mere mobility of the vehicle. Ibid. It then discussed Alston, noting that the Court's holding in that case "essentially added a requirement that is not part

of the federal automobile standard," namely, that "the stop and search of the vehicle cannot be pre-planned -- it must be unforeseen and spontaneous." Ibid. (citing Alston, supra, 88 N.J. at 233-34). However, that language did not supplant the separate exigency aspects of the analysis. Discussing the Martin Court's exposition of facts that created the exigency in that case, the Pena-Flores majority stated: "Obviously, there would have been no need to detail the facts and circumstances that created the exigency had the mere mobility of the vehicle sufficed." Id. at 22. The Pena-Flores Court noted that "together Alston and Martin rejected the federal standard by declaring (1) that the stop had to be unforeseen and spontaneous and (2) that exigency must be assessed based on the particular facts and circumstances of the case, and does not automatically flow from the mobility of the vehicle." Ibid. (emphasis added).

Following a discussion of Cooke and the consistency of our past precedent, the Pena-Flores Court held that "the warrantless search of an automobile in New Jersey is permissible where (1) the stop is unexpected; (2) the police have probable cause to believe that the vehicle contains contraband or evidence of a crime; and (3) exigent circumstances exist under which it is impracticable to obtain a warrant." Id. at 28 (citations omitted). The Court then provided a list of examples of

14

considerations that may be pertinent when assessing exigent circumstances. Id. at 29.

Pena-Flores and Cooke are soundly reasoned and fully supported decisions. Their reasoning tracks carefully the factual bases and legal reasoning for the holdings of earlier precedent. For the majority to pronounce them unsound in principle, ante at ___ (slip op. at 50), is unfair. That pronouncement reflects only the majority's own contrary view of earlier law. In particular, I note the majority's canonization of Alston as the preeminent word on the automobile exception in New Jersey. The majority has distilled Alston to a single-sentence standard that conveniently ignores Alston's own acknowledgment (and Pena-Flores's underscoring) of the presence of exigency in the circumstances, independent of the spontaneity and unforeseen nature of the roadside encounter. The Pena-Flores dissent was not persuasive on this point. Its repetition in the majority's opinion does not enhance it.

Indeed, the majority does not deal squarely with Pena-Flores either, mischaracterizing it as having established an unworkable multi-factor test, ante at ___, ___ (slip op. at 3, 46), notwithstanding the Pena-Flores Court's immediate and solid rejection of that same assertion when it first was advanced as a dissenter's complaint, see Pena-Flores, supra, 198 N.J. at 29 n.6. That point, and others, require separate attention in my

15

response to the second reason advanced by the majority for overturning both Pena-Flores and Cooke -- namely, that they are unworkable in practice.  However, let it be said that I dissent from the reasoning and holding of the majority that Pena-Flores and Cooke are unsound in principle.

## III.

The State contends that Pena-Flores is "unworkable in practice" for two principal reasons:  first, that a post-Pena-Flores pilot program has exposed practical difficulties with roadside telephonic search warrants; and second, that Pena-Flores has produced the "unintended negative consequences" of increasing consent-based searches and expanding police discretion.  In reality, however, the so-called evidence of the practical difficulties with obtaining roadside telephonic warrants is derived from a single six-month pilot program that ended three years ago and whose results are arguably promising, and at worst inconclusive.  Further, the State's arguments regarding unintended and supposedly negative consequences of Pena-Flores are comprised of speculation and leaps in logic, and are not borne out by the State's own data.  In sum, the State falls far short of demonstrating its heavy burden that Pena-Flores is unworkable in practice and that stare decisis must yield.

## A.

16

In Pena-Flores, supra, the Court recognized a need for "an efficient and speedy electronic and telephonic warrant procedure that will be available to [police] on the scene[,] . . . obviate the need for difficult exigency assessments[,] and . . . guarantee our citizens the protections that the warrant requirement affords -- an evaluation of probable cause by a neutral judicial officer." 198 N.J. at 36. To that end, the Pena-Flores Court ordered the creation of a task force "to address the practical issues involved in obtaining telephonic and electronic warrants." Id. at 35. The task force was to "study . . . telephonic and electronic warrant procedures and make practical suggestions to ensure that technology becomes a vibrant part of our process," including "recommendations for uniform procedures (including forms), equipment, and training, along with an evaluation of the scheme once it is underway." Id. at 35-36. The resulting Supreme Court Special Committee on Telephonic and Electronic Search Warrants (Special Committee) was formed and its findings culminated in a January 2010 report. Report of the Supreme Court Special Committee on Telephonic & Electronic Search Warrants (Jan. 22, 2010) [hereinafter Special Committee Report], available at http://www.judiciary.state.nj.us/notices/2010/n100520b.pdf. The Special Committee Report made detailed recommendations in respect of implementing a telephonic warrant program in New

17

Jersey and set a goal of "no more than [forty-five] minutes, with an ideal goal of [thirty] minutes" for completing the telephonic warrant process.  Id. at 19.

To test the viability of the Special Committee's recommendations, as well as the potential volume of telephonic warrant requests, the Administrative Office of the Courts launched a six-month telephonic warrant pilot program in the Burlington Vicinage, which ran from September 6, 2011, through March 6, 2012.  Superior Court of New Jersey, Burlington Vicinage, Telephonic Search Warrants (Pena-Flores) Pilot Program 3-4, 6 (2012) [hereinafter Pilot Program].  The State argues that the results of that pilot program demonstrate that Pena-Flores's promotion of telephonic and electronic warrants is unworkable in practice.  Specifically, the State points to the fact that the average amount of time it took to obtain a telephonic warrant during the pilot program was fifty-nine minutes, which exceeds the Special Committee Report's goal of a maximum of forty-five minutes.  (Citing Pilot Program, supra, at 6).  On average, thirty-two of those minutes were the time it took for a police officer to connect with a judge on the phone, a process that was facilitated by the county prosecutor's office via a central communications dispatch system.  Pilot Program, supra, at 6.  Focusing on that length of time in particular, the State asserts that the pilot program's failure to meet its

18

target time is attributable to "the human components of any telephonic warrant system," especially the fact that "judges in this State are not like customer service representatives . . . they are not standing by 24/7 to take calls from police and prosecutors."

Although the fifty-nine minute average time to obtain a warrant exceeded the Special Committee's outer-limit target by fourteen minutes, that fact does not lead inevitably to the conclusion that a telephonic warrant program in New Jersey is impracticable.  The Burlington Vicinage pilot program was just that:  a pilot program, one goal of which was to test the initial recommendations of the Special Committee Report.  It was not a test by which the viability of telephonic warrants in New Jersey should decidedly pass or fail.  See Special Committee Report, supra, at iv ("If the number of requests for telephonic search warrants exceeds the ability of the current emergent duty system to handle them, another system should be implemented as quickly as possible.").  By the State's analysis, because the precise approach taken three years ago in a six-month pilot program exceeded its target time by fourteen minutes, telephonic warrants are impracticable.[4]  That line of thinking ignores the

---

[4] The majority makes a point of noting that the average time for Troop C of the State Police to procure a telephonic warrant was between 1.5 and two hours. Ante at ___ (slip op. at 35). However, that statistic is the average only for Troop C, and was

fact that "the human components of any telephonic warrant system" are not static, but rather a function of the practices and procedures that human beings design and implement, as well as the will and energy they put into doing so.

Properly viewed, the pilot program and its results are a mere jumping off point for building a workable telephonic or electronic warrant system, or at least trying in earnest to do so. The State could have attempted to improve upon the pilot program's approach in the three years since it concluded, but, significantly, it points to no evidence of having done so. The State also presents no evidence that improvement on the average time to obtain a telephonic warrant was impossible or unlikely,[5] or that there was no way to adjust the pilot program to make it more convenient for all parties involved. To the contrary, it would seem that ongoing developments in technology make advances in efficiency more and more likely.

based on a universe of sixteen applications for telephonic warrants. Pilot Program, supra, at 10. It is hardly representative of the whole. The average time for the Burlington pilot program, based on a total of forty-two applications, six of which were from the State Police, was fifty-nine minutes. Id. at 6.

[5] Indeed the ACLU asserts that improvement was occurring; during the two months after the pilot program technically ended, but for which data was collected, the average time to obtain a telephonic warrant had decreased to forty-three minutes.

The fact that New Jersey already has functioning systems to telephonically and electronically apply for and obtain temporary restraining orders (TROs) in several settings is strong evidence that telephonic or electronic warrants can work where there is a will to make them work. For example, as the ACLU points out, the judiciary and law enforcement have implemented an electronic filing system for TROs to protect victims of domestic violence, which "allows police to fill out an electronic form, teleconference with the judge, and print out the approved TRO in moments." New Jersey Courts Annual Report 2007-2008, at 1, 17, available at http://www.judiciary.state.nj.us/pressrel/ARNJCourts08.pdf; see also R. 5:7A(b) (providing that domestic violence TRO may be issued "upon sworn oral testimony . . . communicated to the judge by telephone, radio or other means of electronic communication"). Notably, "[o]n weekends, holidays and other times when the court is closed," Family Part and municipal court judges "shall be assigned to accept complaints and issue emergency . . . [TROs]." N.J.S.A. 2C:25-28(a). Similarly, "[a] judge may issue an arrest warrant on sworn oral testimony communicated through telephone, radio or other means of electronic communication." R. 3:2-3(b). Restraining orders for certain criminal offenders may also be issued through such telephonic or electronic communication. N.J.S.A. 2C:35-5.7(a).

21

That other states have implemented telephonic and electronic warrant programs is further evidence that such a feat is possible where the will to do so exists.  See Missouri v. McNeely, ___ U.S., ___, ___, 133 S. Ct. 1552, 1562, 185 L. Ed. 2d 696, 708 (2013) ("Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing.").  In Utah, with the introduction of an "e-warrant" system, "police officers can process a search warrant in five to 15 minutes.  The police officer begins by texting the search warrant request directly to the judge on call who then reviews the search warrant online, electronically signs the warrant, and emails it back to the officer to serve."  State of Utah Judiciary, 2014 Annual Report to the Community 8 (2014), available at http://www.utcourts.gov/annualreport/2014-CourtsAnnual.pdf; see also Jason Bergreen, Judges, Cops Dote on Quicker Warrant System, Salt Lake Trib. (Dec. 29, 2008, 11:00 AM),

http://archive.sltrib.com/article.php?id=11309849&itype=NGPSID.

In Missouri, 2004 and 2010 amendments to that state's "search warrant statute authoriz[e] search warrant applications to be made by electronic means and with electronic signatures[,] permit[ting] e-mail search warrants."  H. Morley Swingle & Lane

P. Thomasson, Beam Me Up:  Upgrading Search Warrants with Technology, 69 J. Mo. B. 16, 19 (2013).  As of June 2012, thirteen percent of Missouri prosecutors' offices had obtained search warrants via e-mail, and five more offices (4.3 percent) "had a process in place" to begin doing the same.  Ibid. Missouri counties have incorporated "electronic means" into the warrant process in various and creative ways.  Ibid.  In Christian County, Missouri, a judge and prosecutor use iPads to sign e-mailed warrants using "a 99-cent signature application." Ibid.  "In Henry County, a streamlined process has been established" wherein an officer can e-mail a warrant application and affidavit to a prosecutor, who can sign it with a signature application and forward it to a judge.  Id. at 20.  The judge then can sign it using an application and e-mail it back to the officer, whose patrol car is equipped with a printer.  Ibid. Finally, as of 2012, Platte County had a plan "to use Skype with its electronic search warrant process, so the judge, prosecutor and law enforcement officer can see each other by video conferencing while the warrants are being obtained."  Ibid. (footnote omitted).

Those efforts, and successes, in other states -- as well as this State's implementation of electronic and telephonic restraining orders and arrest warrants -- demonstrate that the results of a single six-month pilot program using telephonic

warrants cannot fairly be viewed as conclusive evidence of the impracticability of a telephonic or electronic search warrant program in New Jersey. That is particularly so given that the pilot program took place in 2011-2012. Technology already has evolved since then, and the efforts of other states indicate that there were, and are, many more methods to try for quickly procuring a warrant, including the use of e-mail, iPads and other mobile devices, and electronic signature applications. Technology cannot solve every issue, but consistent, concerted commitment to maximizing both technological and human resources can go a long way. A little creativity and dedication to resolving the challenges encountered during the pilot program may indeed have gone a long way. But the State's seeming lack of resolve to make telephonic warrants a success cannot and does not prove their impracticability. As the ACLU aptly notes, the will to develop a workable telephonic or electronic warrant program must be derived from Article 1, Paragraph 7 of the New Jersey Constitution, and not from individual governmental actors.[6]

---

[6] The State adds one more point to its argument that telephonic warrants are unworkable. According to the State, the pilot program "by its very design, reveals why telephonic warrants are not likely to emerge as a viable replacement for the automobile exception." The State contends that "[a]ll of the participants in the pilot program understood that police officers would continue their post-Pena-Flores practice of requesting motorists to consent to a search" prior to trying to obtain a telephonic

24

Seemingly recognizing that the results of the pilot program do not prove that telephonic warrants are impracticable -- a burden that the State must bear to launch a frontal attack on precedent -- the State turns to an alternative ground on which to conclude that Pena-Flores is unworkable.  It asserts that Pena-Flores has produced the "unintended negative consequence" of increasing consent-based searches of automobiles.  As proof that consent-based searches have increased as a result of Pena-Flores, the State points to a study conducted by the Office of Law Enforcement Professional Standards (OLEPS) on the effects of Pena-Flores.  Office of Law Enforcement Professional Standards, The Effects of Pena-Flores on Municipal Police Departments (Oct.

---

warrant.  Further, the State's brief asserts that "participants recognized that the number of telephonic-warrant applications might overwhelm judicial and prosecutorial resources unless most cases . . . [we]re screened out by means of the consent-to-search doctrine."  Thus, according to the State, the increase in consent searches, attributable to pilot program participants' decision to ask for motorists' consent before applying for a warrant, demonstrates that telephonic warrants are unfeasible.  There is an undeniable circularity to that argument.  If the number of telephonic warrant requests would have overwhelmed the system, one goal of the pilot program was to obtain data demonstrating that possibility.  However, participants' preconceived notion that telephonic warrants were unworkable (and the resulting decision to rely on asking motorists for consent to search) does not prove that such warrants are in fact unworkable.  It proves only that program participants had a preconceived belief that a telephonic warrant program was impracticable.

2012) [hereinafter 2012 OLEPS study], available at http://www.nj.gov/oag/oleps/pdfs/OLEPS-Report-Effects-of-Pena-Flores-on-Mun-PDs-10.12.pdf.  The study collected data from motor vehicle stops from a sampling of municipal police departments throughout the state –- 103 of the approximately 550 New Jersey municipal police departments –- as well as from the State Police during the month of April from 2008 (the year before the February 2009 Pena-Flores decision) through 2012. Id. at 2, 6.

The 2012 OLEPS study reveals that consent-based automobile searches increased in municipal police departments from a reported ninety-six in April 2008 to 271 in April 2012, while the overall number of stops remained relatively unchanged.  Id. at 9, 13.  For the State Police, consent searches increased from nineteen in April 2008 before Pena-Flores to ninety-five in April 2009, just a few months after the Pena-Flores decision. Ibid.  That number steadily increased to 229 consent searches in April 2011.  Ibid.  The State highlights those increases in consent-based searches and characterizes them as a negative consequence of Pena-Flores.  According to the State, the increase in consent searches is a negative effect because asking for consent to search may be coercive when probable cause is "so strong and obvious . . . as to undermine the voluntariness of

26

consent," and when motorists feel that they will be subjected to prolonged detention unless they consent.

Although the voluntariness of consent is undoubtedly paramount, based on the record currently before the Court, the State's argument on this front does not hold up. First, the 2012 OLEPS study itself characterizes consent-based searches as "a relatively rare occurrence," despite the numerical increase in consent searches. 2012 OLEPS Study, supra, at 13. "Most departments had a handful [of consent searches] in the months selected for review." Ibid. In fact, "conversations with local law enforcement officers" indicated that "consent requests [we]re not especially common," a trend "the numbers reinforce." Id. at 14. Specifically, the 2012 OLEPS study found that

> [g]iven that there were 103 departments in the sample, on average there were only 1.07 consent searches granted per department for April 2008, 1.30 for April 2009, 1.85 for April 2010, 2.37 for April 2011, and 2.85 for April 2012. The total number of granted consent searches represents less than 1% of the number of motor vehicle stops reported. Consent requests then, do not occur with great frequency for municipal departments or the State Police.
>
> [Ibid. (emphasis added).]

Importantly, a follow-up OLEPS study conducted in 2013 reiterated those findings and attributed an apparent increase in consent searches from 2012 to 2013 mostly to mere changes in reporting:

27

> While the number of granted consent to search requests does increase by almost 100 stops from April 2012 to April 2013, <u>this increase cannot be attributed to increased use in consent requests.</u> Instead, this increase is more likely to, at least in part, be affected by reporting rather than the true number of events. As a result of the 2012 data request, many departments improved their records of motor vehicle stops, to facilitate such data requests. <u>Thus, while overall, there is a steady, but small, increase in the number of granted consent searches, the large increase for 2013, is not likely a true reflection of activity.</u>
>
> [Office of Law Enforcement Professional Standards, <u>Second Report: The Effects of Pena-Flores on Municipal Police Departments</u> 15 (Dec. 2013) (emphasis added), <u>available at</u> http://www.nj.gov/lps/oleps/pdfs/OLEPS-Report-Effects-of-Pena-Flores-on-Mun-PDs-12.13.pdf.]

Second, the State does not demonstrate that the increase in consent-based searches is actually a <u>negative</u> consequence of <u>Pena-Flores</u>. Roadside consent searches of automobiles do not present a constitutional dilemma when there is "reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity," <u>State v. Carty</u>, 170 <u>N.J.</u> 632, 647 (2002), and when consent is given voluntarily, <u>see</u> <u>State v. Johnson</u>, 68 <u>N.J.</u> 349, 353-54 (1975). It is entirely appropriate for law enforcement to simply ask a motorist for consent to search his or her car when probable cause develops before resorting to trying to obtain a warrant, telephonic or otherwise. Although courts must

28

always be vigilant to claims of coerced or involuntary consent, the State has failed to produce any evidence that officers have been obtaining consent coercively or that there is great risk of such inappropriate behavior. In fact, at oral argument the State expressly represented that none of the consent-based searches recorded in the OLEPS study were found to be coercive to its knowledge. The State's argument based on alleged negative aspects of consent searches is thus entirely speculative, a point repeatedly confirmed upon close examination of its discussion of that assertion in its briefs to this Court.

Specifically, the State's briefs posit that a defendant "may" challenge a consent-based search when probable cause is strong, that a defendant "may" contend that "there was no genuine option to refuse consent," and that a defendant "may" argue that consent was invalid based on fear of being detained for a prolonged period of time. However, the State points to no instances in which defendants have made such arguments, and it cites no case where a post-Pena-Flores consent search has been invalidated on such grounds. Nevertheless, the Court's majority grabs hold of that argument to support its conclusion that the State has proven unworkability.

The majority focuses on the State's -- again speculative -- assertion that a motorist would feel pressure to consent at the prospect of being detained for an inordinate amount of time.

29

Ante at ___ (slip op. at 45). However, it is not clear that the current average of fifty-nine minutes from the Burlington pilot program is an inordinate delay. Despite that voiced concern, the State does not demonstrate any earnest efforts to improve upon the results of the pilot program. Nor does the State address how its "fears" are balanced by the fact that law enforcement officials must inform people of their right to refuse consent in order to carry the State's burden of showing that consent given was truly voluntary. Johnson, supra, 68 N.J. at 353-54 (holding that essential element of voluntary consent is "knowledge of the right to refuse consent"). Indeed, it is notable that not a single privacy or civil liberties group writes in support of the State's position as amicus curiae. In fact, the ACLU, writing in support of defendant, does not decry the increase in consent searches following Pena-Flores as a negative unintended consequence of that decision.

The majority relies on the State's asserted concern for motorists' constitutional rights in the wake of an increase in consent searches. However, that concern is suspect in light of the fact that the State's solution is to take away all motorists' ability to first choose to consent by instead giving officers a nearly automatic right to search by way of a rote automobile exception to the warrant requirement based on unreviewed officer belief that probable cause exists. Instead

30

of instituting increased officer training on consent-search procedures in order to prevent coercive situations -- a logical and direct prophylactic measure against coercive consent searches -- the State's answer is to take away all choice from motorists. This "remedy" belies concern for constitutional rights and in fact scales back motorists' constitutional protections.

Although the majority posits that detention on the side of road for an hour is, or at least debatably is, more intrusive than a search of one's vehicle, one wonders why individual motorists should not be allowed to make that determination for themselves. The rational response to the potentiality of placing motorists in a coercive situation is to properly train officers and to reduce or eliminate situational pressure to consent by developing functional and efficient electronic and telephonic warrant procedures so that motorists may comfortably choose for themselves whether to insist on the constitutional default -- a warrant approved by a neutral magistrate -- or whether to waive that right.

Finally, a few words on the last two justifications asserted in this record to overturn settled law on warrantless roadside searches of automobiles. The State asserts that Pena-Flores has had (or perhaps will have) the effect of increasing "de-policing" and expanding police discretion. The State's

arguments on those points are equally if not more speculative than its arguments about the effects of consent-based searches.

As to the first, the State contends that when it is impractical to get a warrant to search a car, police will release motorists even though there is probable cause to search their cars, resulting in "de-policing."  Although the 2012 OLEPS Study states that "many departments indicated that in the face of a denied consent, it was rare to apply for a search warrant," the Study posits that the failure to apply for a warrant could have indicated de-policing or lack of probable cause.  2012 OLEPS Study, supra, at 16.  The study contains only speculation that de-policing was the motivating force behind an officer's decision not to apply for a warrant when a motorist denied consent:  "Rather than spend the several hours to apply for a search warrant and tow a vehicle, officers may have been willing to allow motorists to leave without further investigation." Ibid. (emphasis added).  In the absence of any data or statistics indicating that "de-policing" is in fact occurring, such raw speculation is not a basis on which to alter motorists' constitutional rights.

As to the second, it bears noting that the last point made by the State in support of its claims -- that by "forcing officers to decide whether it is worth the time and effort to obtain a warrant, the Pena-Flores rule has unwittingly enlarged

the ambit of a patrol officer's enforcement discretion" -- is similarly without basis in fact. Perhaps, in this regard, the State is merely latching onto the Pena-Flores dissent's mischaracterization of the examples of exigency, helpfully set out in Cooke and in Pena-Flores, as a hard-and-fast multi-factor test that is difficult to apply. See Pena-Flores, supra, 198 N.J. at 26-29, 29 (noting that "[l]egitimate considerations are as varied as the possible scenarios surrounding an automobile stop"); Cooke, supra, 163 N.J. at 668-71. The dissent in Pena-Flores was called out by the Pena-Flores majority for its inaccurate and misleading recasting of what the majority opinion said. Pena-Flores, supra, 198 N.J. at 29 n.6 (explaining that contrary to dissent's characterization, majority did not "establish a new 'multi-factor test,' but rather "merely detailed, by way of example but not limitation, the various factors that our prior cases have recognized as relevant to an exigency analysis"). Sadly, the dissent then, and the State and the majority now, persist in that mischaracterization.

The bull's-eye that the Pena-Flores dissenters put on the back of that decision has finally paid off –- not because of the proof that the State has mustered in this record, but rather from re-characterization of prior case law and lack of scrutiny of the State's evidence in alleged support of its practicality argument. In my view, the majority's analysis of the legal and

33

factual bases for overturning <u>Pena-Flores</u> and <u>Cooke</u> are woefully inadequate. The State has not carried its burden to justify overturning our state constitutional law governing warrantless automobile searches and neither is the majority persuasive in its analysis that the State has done so.

IV.

The majority's conclusion represents, in essence, a retreat to the federal standard for warrantless searches of an automobile expressly rejected by the Court in <u>Cooke</u>. Ironically, the majority's step towards the federal standard comes at a time when federal jurisprudence is deviating away from any per se categories of assumed exigency. <u>See, e.g.</u>, <u>McNeely</u>, <u>supra</u>, ___ <u>U.S.</u> ___, 133 <u>S. Ct.</u> 1552, 185 <u>L. Ed.</u> 2d 696; <u>Arizona v. Gant</u>, 556 <u>U.S.</u> 332, 129 <u>S. Ct.</u> 1710, 173 <u>L. Ed.</u> 2d 485 (2009).

In <u>Gant</u>, <u>supra</u>, the United States Supreme Court rejected the broad reading of its decision in <u>New York v. Belton</u>, 453 <u>U.S.</u> 454, 101 <u>S. Ct.</u> 2860, 69 <u>L. Ed.</u> 2d 768 (1981), that would permit officers to conduct an automobile search incident to arrest, irrespective of whether the area searched was within the arrestee's reach at the time of the search. 556 <u>U.S.</u> at 344, 129 <u>S. Ct.</u> at 1720, 173 <u>L. Ed.</u> 2d at 497. The Court noted that "[c]onstruing <u>Belton</u> broadly to allow vehicle searches incident to <u>any</u> arrest would serve no purpose except to provide a police

34

entitlement, and it is anathema to the Fourth Amendment to permit a warrantless search on that basis." Id. at 347, 129 S. Ct. at 1721, 173 L. Ed. 2d at 499 (emphasis added).

In McNeely, supra, the United States Supreme Court ruled that the dissipation of alcohol in the body, without more, did not constitute exigency to justify a warrantless blood draw of a drunk-driving suspect. ___ U.S. at ___, 133 S. Ct. at 1568, 185 L. Ed. 2d at 715. In doing so, the Court noted that

> the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake. Moreover, a case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments.
>
> [Id. at ___, 133 S. Ct. at 1564, 185 L. Ed. 2d at 710.]

Importantly, the McNeely Court noted that adoption of a restrictive, categorical approach would ignore technological changes in the expedition of obtaining warrants. Id. at ___-___, 133 S. Ct. at 1561-63, 185 L. Ed. 2d at 708-09.

One can only wonder why the State and the majority of this Court find it appropriate to turn from the progressive approach

35

historically taken in this State to privacy and constitutional rights of motorists.  I cannot join this backward step.

I respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO. _____A-9_____          SEPTEMBER TERM 2014

ON APPEAL FROM _____Appellate Division, Superior Court_____

STATE OF NEW JERSEY,

       Plaintiff-Appellant,

           v.

WILLIAM L. WITT,

       Defendant-Respondent.

DECIDED _____September 24, 2015_____

_____Chief Justice Rabner_____ PRESIDING

OPINION BY _____Justice Albin_____

CONCURRING/DISSENTING OPINION BY_____

DISSENTING OPINION BY ____Justice LaVecchia_____

| CHECKLIST | AFFIRM AND REMAND | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | | X |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | | X |
| TOTALS | 5 | 2 |